The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number:

Filing Date: March 6, 2025

**NO. S-1-SC-40105**

**DAWN AMDOR, STEPHANIE SEDILLO, JEREE TOMASI, RETIRED LAW ENFORCEMENT OFFICERS, GARY AINSWORTH, SHAWN BLAS, RUBEN CHAVEZ, GRAIG MARTIN, and JOE POLISAR HOUSE MINORITY FLOOR LEADER, T. RYAN LANE and REPRESENTATIVES GAIL ARMSTRONG, BRIAN BACA, JOHN BLOCK, CATHRYNN BROWN, JACK CHATFIELD, MARK DUNCAN, CANDY SPENCE EZZELL, JASON HARPER, JOSHUA HERNANDEZ, JENIFER JONES, STEPHANI LORD, ALAN MARTINEZ, JIMMY MASON, TANYA MOYA, ROD MONTOYA, GREG NIBERT, RANDALL PETTIGREW, ANDREA REEB, WILLIAM REHM, LARRY SCOTT, LUIS TERRAZAS, JIM TOWNSEND, HARLAN VINCENT, and MARTIN ZAMORA, SENATE MINORITY FLOOR LEADER GREGORY BACA and SENATORS GRAIG BRANDT, WILLIAM BURT, CRYSTAL DIAMOND BRANTLEY, DAVID GALLEGOS, RON GRIGGS, STUART INGLE, MARK MOORES, STEVEN NEVILLE, CLIFF PIRTLE, JOSHUA SANCHEZ, GREGG SCHMEDES, WILLIAM SHARER, and PAT WOODS, THE REPUBLICAN PARTY OF NEW MEXICO, THE LIBERTARIAN PARTY OF NEW MEXICO, and THE NATIONAL RIFLE ASSOCIATION OF AMERICA,**

Petitioners,

v.

**MICHELLE LUJAN GRISHAM, in her official capacity as Governor of New Mexico, and PATRICK ALLEN, in his official capacity as Secretary of the Department of Health,**

Respondents.

**ORIGINAL PROCEEDING**

Harrison & Hart, LLC
Carter B. Harrison IV
Albuquerque, NM

Kennedy, Hernandez & Harrison, P.C.
Paul J. Kennedy
Jessica M. Hernandez
Elizabeth A. Harrison
Albuquerque, NM

T. Ryan Lane, P.C.
T. Ryan Lane
Aztec, NM

Baca Law Offices
Greg Baca
Los Lunas, NM

for Petitioners

Sophie Cooper
Corrales, NM

Counsel for Petitioner
Libertarian Party of New Mexico

Office of the Governor
Holly Agajanian, Chief General Counsel
Kyle P. Duffy, Deputy General Counsel
Santa Fe, NM

for Respondents

**OPINION**

**BACON, Justice.**

{1} The petition before the Court requires us to further consider the scope of the Governor's authority to declare and address a public health emergency.

{2} The petition challenges three executive orders (the emergency orders) declaring or addressing gun violence and drug abuse as public health emergencies pursuant to the Public Health Emergency Response Act (the PHERA), NMSA 1978, §§ 12-10A-1 to -19 (2003, as amended through 2015), among other things. *See* State of N.M., Exec. Ord. 2023-135 (EO 2023-135) (Oct. 5, 2023) (renewing the Governor's declaration of a public health emergency "due to gun violence"); State of N.M., Exec. Ord. 2023-136 (EO 2023-136) (Oct. 5, 2023) (renewing the Governor's declaration of a public health emergency "due to drug abuse");[1] N.M. Dep't of Health Amended Public Health Emergency Order Imposing Temporary Firearm Restrictions, Drug Monitoring[,] and Other Public Safety Measures (first Amended PHEO) (Sept. 15, 2023).[2] Petitioners—New Mexico Legislators,

[1]*See* State of N.M., Exec. Ord. 2023-135 and State of N.M., Exec. Ord. 2023-136, https://www.governor.state.nm.us/about-the-governor/executive-orders/executive-orders-archive (last visited Feb. 6, 2025).

[2]*See* N.M. Dep't of Health Amended Public Health Emergency Order Imposing Temporary Firearm Restrictions, Drug Monitoring[,] and Other Public Safety Measures, https://www.governor.state.nm.us/wp-content/uploads/2023/09/091523-PHO-amended-guns-and-drug-abuse.pdf (last visited Feb. 6, 2025).

Bernalillo County gun and gun shop owners, two political parties (Republican and Libertarian Parties of New Mexico), retired law enforcement officers, and a national advocacy group—argue this Court should issue a writ of mandamus striking down the emergency orders as exceeding the proper scope of the PHERA, the proper scope of the police power, and the separation-of-powers doctrine. Pursuant to these claims, Petitioners assert that the emergency orders issued by Respondents Governor Michelle Lujan Grisham (Governor) and Department of Health (DOH) Secretary Patrick Allen (Secretary) "implicate[] fundamental constitutional questions of great public importance." *State ex rel. Sandel v. N.M. Pub. Util. Comm'n*, 1999-NMSC-019, ¶ 11, 127 N.M. 272, 980 P.2d 55.

{3} We hold that Petitioners do not meet their burden to show the emergency orders violate either the challenged scope of the PHERA or the separation-of-powers doctrine. However, we grant the petition as to the emergency orders' suspension of the Juvenile Detention Alternatives Initiative (JDAI) program, an action that exceeds the limits of the police power.

## I. BACKGROUND

{4} The first iterations of the emergency orders challenged here were issued on September 7-8, 2023: State of N.M., Exec. Ord. 2023-130 (EO 2023-130) (Sept. 7, 2023), declaring a public health emergency due to gun violence; State of N.M., Exec.

2

Ord. 2023-132 (EO 2023-132) (Sept. 8, 2023), declaring a public health emergency due to drug abuse; and the original "Public Health Emergency Order Imposing Temporary Firearm Restrictions, Drug Monitoring[,] and Other Public Safety Measures" (original PHEO), (Sept. 8, 2023).

{5}     EO 2023-130 cited numerous statistics on gun violence in New Mexico, recent incidents[3] of gun violence, and the deleterious social effects[4] of gun violence as the basis for declaring a public health emergency "of unknown duration." The information cited in EO 2023-130 implicitly asserted the need for emergency response, including that "New Mexico has recently experienced an increasing amount of mass shootings"; "New Mexico consistently has some of the highest rates of gun violence in the nation"; "the rate of gun deaths in New Mexico increased 43% from 2009 to 2018, compared to an 18% increase over this same time period nationwide"; "guns are the leading cause of death among children and teens in New Mexico"; "New Mexico has recently experienced an increasing amount of mass shootings"; and "the increasing number of gunshot victims strains our already over-

---

[3]EO 2023-130 cites the deaths of three children in as many months and recent mass shootings in Farmington and Red River.
[4]EO 2023-130 declares that "gun-related deaths and injuries have resulted in devastating physical and emotional consequences for individuals, families, and communities throughout the State" as well as "emotional trauma, economic burdens, and long-lasting consequences for those affected individuals and their families."

3

burdened healthcare system and places undue pressure on medical professionals and resources." EO 2023-130 invoked the Governor's authority to declare an emergency under the PHERA and declared that gun violence "also constitutes a man-made disaster causing or threatening widespread physical or economic harm that is beyond local control and requiring the resources of the State pursuant to the All Hazard Emergency Management Act[, NMSA 1978, §§ 12-10-1 to -10 (1959, as amended through 2007)]." EO 2023-130 also directed several state agencies to collaborate with the Governor's office to provide a coordinated response to the gun violence emergency.

{6}     EO 2023-132 was similar but designed to combat what the Governor declared to be "a state of public emergency . . . throughout the State due to drug abuse."[5] The information cited in EO 2023-132 implicitly asserted the need for emergency response, including "a growing and alarming trend of drug abuse, including the misuse of prescription opioids, fentanyl, heroin, and other illicit substances," the consequences of which trend include "a significant increase in drug-related deaths, with 1,501 fatal overdoses reported in the state in 2021—the fifth highest overdose

---

[5]EO 2023-132 additionally asserts "communities across New Mexico are grappling with the social and economic burdens of drug addiction, including the strain on healthcare resources, increased crime rates, homelessness, and disrupted family structures."

rate in the nation"; "escalat[ion of] [associated] risks . . . , contributing to a surge in overdose incidents" due to "the accessibility and prevalence of potent synthetic opioids"; "unprecedented challenges due to [related] demands" on the state's healthcare system; "the rising number of cases involving parental substance abuse and its subsequent effect on child welfare"; and that "the State's existing efforts to combat drug abuse . . . require immediate reinforcement and coordination to effectively address this public health crisis."

{7}     Under the authorities of EOs 2023-130 and 2023-132, the Secretary issued the original PHEO, finding that "temporary firearm restrictions, drug monitoring, and other public safety measures are necessary to address the current public health emergencies." The provisions of the original PHEO included broad restrictions on firearm possession in certain cities and counties,[6] subject to numerous exceptions; firearms-related regulatory duties imposed on certain state agencies; public safety duties imposed on certain law enforcement agencies; and drug-related regulation.

---

[6]It is uncontested that the affected communities are the City of Albuquerque and Bernalillo County, defined as in the original PHEO as "cities or counties averaging 1,000 or more violent crimes per 100,000 residents per year since 2021 according to [the] Federal Bureau of Investigation's Uniform Crime Reporting Program AND more than 90 firearm-related emergency department visits per 100,000 residents from July 2022 to June 2023 according to the New Mexico Department of Public Health."

5

{8}     Litigation in federal court began shortly thereafter seeking to enjoin enforcement of the firearms restrictions in Sections 1 and 4 of the original PHEO. *We the Patriots*, *Inc. v. Grisham*, 697 F. Supp. 3d 1222, 1228 (D.N.M. 2023). This litigation resulted in a temporary restraining order issued on September 13, 2023, specifically enjoining New Mexico officials "from applying, enforcing, or attempting to enforce, either criminally or civilly," the restrictions on gun possession set forth in the original PHEO.[7]

{9}     On September 14, 2023, Petitioners filed their Verified Petition for Extraordinary Writ and Request for Stay in this Court.

{10}    On September 15, 2023, the Secretary issued the first Amended PHEO, which continued most of the provisions of the original PHEO but drastically reduced the gun restrictions in seeming acknowledgment of the federal district court temporary restraining order. The first Amended PHEO mirrored its predecessor in asserting that "temporary firearm restrictions, drug monitoring, and other public safety measures are necessary to address the current public health emergencies."

---

[7]Specifically, the temporary restraining order enjoined Section 1 of the original PHEO in its entirety and enjoined Section 4 "to the extent it imposes additional restrictions on the carrying or possession of firearms that were not already in place prior to its issuance." *Nat'l Ass'n for Gun Rts. v. Grisham*, 1:23-CV-00771-DHU-LF, at *4-5 (D.N.M. Sept. 13, 2023).

6

{11}     Because the first Amended PHEO is central to the instant case—being the focus of Petitioners' revised arguments in their subsequent reply and in oral argument—we summarize its ten emergency measures in greater detail:

(1)     prohibiting gun possession "either openly or concealed in public parks or playgrounds, or other public area[s] provided for children to play in, within cities or counties averaging 1,000 or more violent crimes per 100,000 residents per year since 2021 according to [the] Federal Bureau of Investigation's Uniform Crime Reporting Program AND more than 90 firearm-related emergency department visits per 100,000 residents from July 2022 to June 2023 according to the New Mexico Department of Public Health, except":

     A.     "While traveling to or from a location listed in Paragraph (B) of this section; provided that the firearm is in a locked container or locked with a firearm safety device that renders the firearm inoperable, such as a trigger lock."

     B.     "In areas designated as a state park within the state parks system and owned or managed by the New Mexico Energy, Minerals and Natural Resources Department State Parks Division, or the State Land Office."

(2)     requiring the Regulation and Licensing Department to "conduct monthly inspections of licensed firearms dealers . . . to ensure compliance with all sales and storage laws";

(3)     requiring DOH to "compile and issue a comprehensive report on gunshot victims presenting at hospitals in New Mexico";

(4)     requiring DOH and the Environmental Department to "develop a program to conduct wastewater testing for illicit substances, such as fentanyl, at all public schools";

7

(5)    directing the Children, Youth and Families Department (CYFD) to "immediately suspend the [JDAI] and evaluate juvenile probation protocols";

(6)    directing the Department of Public Safety (DPS) to "dispatch additional officers and resources to Bernalillo County and work with the Albuquerque Police Department and Bernalillo County Sheriff to determine the best use of those resources";

(7)    directing DPS to "coordinate with local law enforcement agencies and the district attorneys' offices and assist in apprehension of individuals with outstanding arrest warrants";

(8)    directing Managed Care Organizations (MCOs) to "immediately ensure that individuals who need drug or alcohol treatment have received a permanent, adequate treatment placement within 24 hours of the request";

(9)    directing the Human Services Department to require MCOs "to provide their plans to achieve continual behavioral health network adequacy";

(10)    directing the Department of Corrections [(DOC)] and the Department of Homeland Security [(DHS)] to "provide assistance to the Bernalillo County Metropolitan Detention Center [(MDC)] and its contractors to ensure adequate staffing, space, and screening for arrested and incarcerated individuals."

We note that provisions 8, 9, and 10 were new directives not included in the original PHEO.

{12}    As in the original PHEO, the first Amended PHEO cited the following legal authorities for the above emergency measures:

the Public Health Act, NMSA 1978, Sections 24-1-1 to -40 [1973, as amended through 2022], [the *PHERA*, enumerated above], the

8

Department of Health Act, NMSA 1978, Sections 9-7-1 to -18 [1977, as amended through 2019], and *inherent constitutional police powers* of the New Mexico state government to preserve and promote public health and safety, to maintain and enforce rules for the control of a condition of public health importance.

(Emphasis added.) As Petitioners note, these are the same authorities relied upon for executive action related to the COVID-19 public health emergency. *Accord Grisham v. Reeb*, 2021-NMSC-006, ¶ 3, 480 P.3d. 852.

{13}     On October 5, 2023, the Governor renewed EO 2023-130 and EO 2023-132 by means of State of N.M., Exec. Ord. 2023-135 (EO 2023-135) (Oct. 5, 2023) and State of N.M., Exec. Ord. 2023-136 (EO 2023-136) (Oct. 5, 2023), respectively. We note that these renewals are substantively identical to the original EOs in their supporting content and directives. We also note that the EOs were consistently renewed, effective through October 13, 2024, with some supporting content added. *See* State of N.M., Exec. Ord. 2024-141 (EO 2024-141) (Sept. 13, 2024) and State of N.M., Exec. Ord. 2024-140 (EO 2024-140) (Sept. 13, 2024)[8] (renewing the declarations of public health emergencies of gun violence and drug abuse, respectively).

_____

[8]*See* State of N.M. Exec. Ord. 2024-140, https://www.governor.state.nm.us/wp-content/uploads/2024/09/Executive-Order-2024-142.pdf; State of N.M. Exec. Ord. 2024-141, https://www.governor.state.nm.us/wp-content/uploads/2024/09/Executive-Order-2024-141.pdf (last visited Feb. 7, 2025).

{14}     A second Amended PHEO[9] (second Amended PHEO) was subsequently issued by the Secretary on October 6, 2023, which in relevant part removed "or other public area[s] provided for children to play in" from the firearm restrictions in Section 1; removed the provision requiring a comprehensive report on gunshot victims; and added a requirement that DPS organize safe surrender events in designated cities. We note, however, that Petitioners' reply in support of their petition, filed on October 31, 2023, does not cite this second Amended PHEO, instead challenging only the first Amended PHEO of September 15, 2023.[10] Accordingly, we analyze the claims before us without regard to the second Amended PHEO.

{15}     We also note that Petitioners' arguments have changed from their petition to their reply, presumably in response to the concurrent federal litigation and to Respondents' amendments to the original PHEO. Notably, we construe Petitioners'

---

[9]*See* N.M. Dep't of Health Amended Public Health Emergency Order Imposing Temporary Firearm Restrictions, Drug Monitoring[,] and Other Public Safety Measures, https://cv.nmhealth.org/wp-content/uploads/2023/10/NMAC-PHO-20231006-Amended.pdf (last visited Feb. 6, 2025).

[10]We note that Petitioners' reply makes no mention of the second Amended PHEO's added *safe surrender* provision or the amendment of Section 1, thereby reinforcing that their challenge to the PHEOs is limited to the first Amended PHEO. In addition, the reply cites Petitioners' notification to "the Court of these amendments on September 18, 2023," in their Notice of Supplemental Authority, which notice concerned the first Amended PHEO.

revised arguments as abandoning their claims regarding the right to bear arms under the Second Amendment of the United States Constitution and Article II, Section 6 of the New Mexico Constitution. Whereas the Petition expressly invoked those provisions, the reply concedes that "because the firearm-regulation components of the original PHEO have now been altered so dramatically, this Petition is no longer the appropriate vehicle to adjudicate such a claim." Our conclusion is bolstered by Petitioners' lack of argument on this issue in their reply and oral argument[11] and their "concur[rence] with the Respondents" therein that the Court should not reach it.[12] Accordingly, we do not analyze Petitioners' challenges under the Second Amendment or Article II, Section 6 of the New Mexico Constitution.

---

[11]This lack of argument is significant, as Petitioners otherwise allude in the reply to the "capable of repetition yet evading review" exception to mootness and to "the moving target put up by the evolving PHEOs." However, in the absence of actual argument we will not "promulgate case law based on our own speculation rather than the parties' carefully considered arguments." *Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 70, 309 P.3d 53.

[12]In their mootness argument, Respondents also bolster our conclusion by attesting in briefing that "neither the Governor nor the Secretary of Health ha[s] any intention o[f] reimposing these broad restrictions" on firearm possession, citing *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1116 n.15 (10th Cir. 2010) (citing cases ruled moot based on governmental officials' voluntary cessation of challenged practices). However, we do not rely on this proffer, as no such statement appears in the orders of which we have taken judicial notice. *See Wall v. Pate*, 1986-NMSC-014, ¶ 5, 104 N.M. 1, 715 P.2d 449 ("Argument of counsel is not evidence." (citation omitted)), *overruled on other grounds by Sunnyland Farms, Inc. v Cent. N.M. Elec. Coop.*, 2013-NMSC-017, 301 P.3d 387.

## II. DISCUSSION

{16} Before reaching the merits of Petitioners' claims, we first consider three preliminary matters: whether Petitioners have standing, whether a writ of mandamus would be the proper form of relief, and whether this case is now moot.

## A. Standing

{17} Petitioners assert three bases for their standing to bring these claims. First, "a party's standing is determined at the time the lawsuit was filed," thus certain Petitioners have standing regarding their challenges to firearm restrictions despite changes to the original PHEO and to Petitioners' arguments, as discussed above. *Deutche Bank Nat'l Tr. Co. v. Johnston*, 2016-NMSC-013, ¶ 23, 369 P.3d 1046 (internal quotation marks and citation omitted). Here, Petitioners cite Respondents' concession that "the Bernalillo County gun owners could have demonstrated standing regarding the (now moot) issue of the [original] PHEO's *rescinded* restrictions." Second, Petitioners present presumptive bases for standing for each class of Petitioners "even if the case were filed today." Third, Petitioners argue that clarifying the scope of Respondents' emergency authority warrants application of the great-public-importance exception to traditional standing, regarding the scope of Respondents' emergency authority.

**{18}** "This Court has long recognized that we may, in our discretion, grant standing to private parties to vindicate the public interest in cases presenting issues of great public importance." *State ex rel. Candelaria v. Grisham*, 2023-NMSC-031, ¶ 7, 539 P.3d 690 (internal quotation marks and citation omitted); *see State ex rel. Coll v. Johnson*, 1999-NMSC-036, ¶ 21, 128 N.M. 154, 990 P.2d 1277 (noting cases in which standing under the great-public-importance doctrine was granted pursuant to separation-of-powers challenges under N.M. Const. art. III, § 1). We conclude this case presents matters of great public importance, including as a challenge under the separation-of-powers doctrine to the scope of any governor's statutory and constitutional authority to act in a purported public health emergency. *See State ex rel. Taylor v. Johnson*, 1998-NMSC-015, ¶ 17, 125 N.M. 343, 961 P.2d 768 ("The balance and maintenance of governmental power is of great public concern."). Under that conclusion, we confer standing.

**{19}** Having determined that Petitioners have standing, we next consider whether a writ of mandamus is the proper method of relief.

**B.    Mandamus**

**{20}** "Mandamus may be used either to compel the performance of an affirmative act where the duty to perform the act is clearly enjoined by law, or it may be used in a prohibitory manner to prohibit unconstitutional official action." *Candelaria*, 2023-

13

NMSC-031, ¶ 8 (internal quotation marks and citation omitted). This Court has original jurisdiction in mandamus for petitions seeking "to restrain one branch of government from unduly encroaching or interfering with the authority of another branch in violation of Article III, Section 1 of our state constitution." *Unite N.M. v. Oliver*, 2019-NMSC-009, ¶ 2, 438 P.3d 343 (internal quotation marks and citation omitted). Under the test articulated in *Sandel*, mandamus will lie

> when the petitioner presents a purely legal issue concerning the non-discretionary duty of a government official that (1) implicates fundamental constitutional questions of great public importance, (2) can be answered on the basis of virtually undisputed facts, and (3) calls for an expeditious resolution that cannot be obtained through other channels such as a direct appeal.

*Sandel*, 1999-NMSC-019, ¶ 11.

{21}   In this case, Petitioners claim *inter alia* separation-of-powers violations and request a writ striking the emergency orders and prohibiting Respondents from exercising their claimed authority. Applying the *Sandel* factors to the instant case, (1) the relief requested implicates fundamental constitutional questions of great public importance, as discussed above pursuant to standing; (2) the parties do not debate the facts; and (3) the public interest is served by an expeditious resolution to these issues. For these reasons, mandamus is a proper vehicle for Petitioners' claims.

{22}   Citing Article IV, Section 6 of the New Mexico Constitution, Respondents argue mandamus is improper here as the Legislature could simply call itself into an

extraordinary session to repeal or modify its emergency powers legislation, and thus this case does not present "a clear threat to the essential nature of state government." However, Respondents do not refute that this case abides under the *Sandel* factors. In addition, we have "exercise[d] jurisdiction [through mandamus] as a matter of controlling necessity" where "the conduct at issue affects, in a fundamental way, the sovereignty of the state, its franchises or prerogatives, or the liberties of its people." *Coll*, 1999-NMSC-036, ¶¶ 21, 24 (internal quotation marks and citations omitted). As above, the issues here regarding separation of executive and legislative powers rise to such a level. Finally, Respondents present no authority supporting that the Legislature calling itself into an extraordinary session is analogous to a "channel[] such as a direct appeal" for expeditious resolution as envisioned in *Sandel*. 1999-NMSC-019, ¶ 11.

**C.  Mootness**

{23}  During the pendency of this case, the Governor elected not to renew both Executive Orders beyond October 13, 2024. *See* EO 2024-141 and EO 2024-140. As a consequence, the second Amended PHEO in effect at that time lost its requisite authority and the challenges to its provisions were effectively rendered moot.

{24}  "'As a general rule, this Court does not decide moot cases.'" *Cobb v. State Canvassing Bd.*, 2006-NMSC-034, ¶ 23, 140 N.M. 77, 140 P.3d 498 (quoting *Gunaji*

15

*v. Macias*, 2001-NMSC-028, ¶ 9, 130 N.M. 734, 31 P.3d 1008). "However, this Court may review moot cases that present issues of substantial public interest or which are capable of repetition yet evade review." *Gunaji*, 2001-NMSC-028, ¶ 10 (citations omitted). While either would suffice as a basis to decide this case, we conclude that both mootness exceptions apply.

{25}   As discussed pursuant to standing and mandamus, the issues here are of substantial public interest, including involvement of constitutional questions. *Cf. Republican Party of N.M. v. N.M. Tax'n and Revenue Dep't.*, 2012-NMSC-026, ¶ 10, 283 P.3d 853 ("A case presents an issue of substantial public interest if it involves a constitutional question or affects a fundamental right such as voting.").

{26}   The issues here are also capable of repetition yet otherwise would evade review under the lapse of the EOs. Certainly, a governor in the future may declare a public health emergency under the PHERA that raises analogous questions. Because a governor may change emergency orders at any time during the course of a declared public health emergency, review of a future challenged provision may similarly be evaded. Here, the original PHEO has been amended twice, and Petitioners reasonably refer to "the moving target put up by the evolving PHEOs." While a governor may have entirely legitimate reasons for amending emergency orders

pursuant to a public health emergency, the context of amendment and lapse in this case supports the applicability of this mootness exception.

{27}   As a result, we reach and turn now to the merits of Petitioners' claims: that Respondents' emergency orders exceed the scope of the PHERA and the police power and violate separation-of-powers principles.

**D.    Standard of Review and Principles of Statutory Construction**

{28}   "[W]e review questions of constitutional and statutory interpretation de novo." *Grisham v. Romero*, 2021-NMSC-009, ¶ 23, 483 P.3d 545 (citation omitted).

{29}   In construing a statute, our "central concern is to determine and give effect to the intent of the [L]egislature." *Cobb*, 2006-NMSC-034, ¶ 34 (internal quotation marks and citation omitted). We begin with the plain language of the challenged statute, and when it "is clear and unambiguous, we must give effect to that language and refrain from further statutory interpretation." *San Juan Agric. Water Users Ass'n. v. KNME-TV*, 2011-NMSC-011, ¶ 17, 150 N.M. 64, 257 P.3d 884 (internal quotation marks and citation omitted). "We generally give the statutory language its ordinary and plain meaning unless the Legislature indicates a different interpretation

17

is necessary." *State v. Wilson*, 2021-NMSC-022, ¶ 16, 489 P.3d 925 (text only)[13] (citation omitted).

{30} "However, we will not be bound by a literal interpretation of the words if such strict interpretation would defeat the intended object of the Legislature." *Romero*, 2021-NMSC-009, ¶ 23 (text only) (citation omitted). "If statutory language is doubtful, ambiguous, or an adherence to the literal use of the words would lead to injustice, absurdity, or contradiction, the court should reject the plain meaning rule in favor of construing the statute according to its obvious spirit or reason." *State v. Vest*, 2021-NMSC-020, ¶ 21, 488 P.3d 626 (internal quotation marks and citation omitted). "In ascertaining a statute's spirit or reason, we consider its history and background, and we read the provisions at issue in the context of the statute as a whole, including its purposes and consequences. All parts of a statute must be read together to ascertain legislative intent, and we are to read the statute in its entirety and construe each part in connection with every other part to produce a harmonious whole," thereby rendering "no part of the statute . . . surplusage or superfluous." *Romero*, 2021-NMSC-009, ¶¶ 23, 27 (text only) (citations omitted).

---

[13]"(Text only)" indicates the omission of nonessential punctuation marks— including internal quotation marks, ellipses, and brackets—that are present in the text of the quoted source, leaving the quoted text otherwise unchanged.

18

{31} "Questions of constitutional construction are governed by the same rules that apply to statutory construction, with courts often using the dictionary for guidance in ascertaining the ordinary meaning of the words at issue." *Pirtle v. Legis. Council Comm. of N.M. Legislature*, 2021-NMSC-026, ¶ 34, 492 P.3d 586 (internal quotation marks and citation omitted).

**E.    Whether the Emergency Orders Exceed Respondents' Authority Under the PHERA**

{32} Petitioners assert that the emergency orders exceed Petitioners' statutory authority to act, as gun violence and drug abuse are not public health emergencies under the PHERA. Citing *Reeb*, *Romero*, and *Legacy Church*, Petitioners distinguish gun violence and drug abuse from COVID-19, both in the latter's nature as an infectious disease and in the "scientific consensus" supporting its qualification as a public health emergency. *See Reeb*, 2021-NMSC-006, ¶¶ 22-23 (taking judicial notice of facts related to COVID-19 being "a highly contagious and potentially fatal disease" (internal quotation marks and citation omitted)); *Romero*, 2021-NMSC-009, ¶¶ 2-7 (same); *Legacy Church*, *Inc. v. Kunkel*, 472 F. Supp. 3d 926, 1066 (D.N.M. July 13, 2020), *aff'd sub nom. Legacy Church*, *Inc. v. Collins*, 853 F. App'x 316 (10th Cir. 2021) (noting that "[c]ourts presiding over similar cases have taken judicial notice of Public Health Orders and scientific consensus regarding the coronavirus"). Additionally, Petitioners propose that judicial review under the

19

PHERA's definition should require that a declared public health emergency must be "sudden" or "unforeseen," a requirement that Petitioners imply is not met by either gun violence or drug abuse.

{33} At the outset, we note that Petitioners offer no clear argument that gun violence and drug abuse cannot satisfy the plain language of the PHERA's definition of "public health emergency." Section 12-10A-3(G). Instead, as discussed further below, Petitioners appear to claim that policy considerations counsel against Respondents' broad reading of Section 12-10A-3(G), which reading "would [overly] extend the Governor's power" and allow "a state of perpetual emergency." Petitioners relatedly raise the concern that "everything" could become a public health emergency under the PHERA, based on the Governor's public statements that "[e]verything is a public health issue," including poverty and environmental problems. To assess their position, we first analyze the plain statutory language of the PHERA provisions cited by Petitioners, then analyze legislative intent to determine whether Petitioners' policy claims prevail thereunder. *See Vest*, 2021-NMSC-020, ¶ 20 ("[T]his analysis need go no further [than plain language,] . . . [h]owever, as a matter of thoroughness, we review the purpose, background, and history of the statute to ensure that our plain-meaning interpretation does not lead to

injustice, absurdity, or contradiction." (internal quotation marks and citation omitted)).

**1.    The emergency orders are consistent with the plain language of the PHERA**

{34}    Section 12-10A-3(G) of the PHERA defines "public health emergency" as "the occurrence or imminent threat of exposure to an extremely dangerous condition or a highly infectious or toxic agent, including a threatening communicable disease, that poses an imminent threat of substantial harm to the population of New Mexico or any portion thereof." Petitioners also point to relevant requirements in Section 12-10A-5 for a governor's declaration: "A state of public health emergency shall be declared in an executive order that specifies: (1) the nature of the public health emergency; . . . [and] (3) the conditions that caused the public health emergency." Section 12-10A-5(B)(1), (3).

{35}    The plain language of Section 12-10A-3(G) makes clear that the Legislature enacted a broad definition of *public health emergency*.[14] First, we note the definition's temporal terms: "occurrence," which is disjunctive from "imminent threat of exposure to." "Occurrence" is commonly defined as "something that

---

[14]Such breadth does not equate to an enactment being improper. *See U.S. v. Yoshida Intern., Inc.*, 526 F.2d 560, 573 (C.C.P.A. 1975) ("The express delegation [of emergency authority to the President by Congress] is broad indeed" in Section 5(b) of the Trading With the Enemy Act, but nonetheless proper.).

21

occurs," and "occur" relevantly means "to come into existence" or "happen." *Occurrence* and *Occur*, Merriam-Webster's Collegiate Dictionary (11th ed. 2005); *see State v. Farish*, 2021-NMSC-030, ¶ 12, 499 P.3d 622 ("The plain meaning of statutory language is informed by dictionary definitions." (citation omitted)). "Imminent" is commonly defined as "ready to take place." *Imminent*, Merriam-Webster's Collegiate Dictionary (11th ed. 2005). "Imminent" has also been defined as "happening soon," or "menacingly near." *Imminent*, Merriam-Webster.com, http://merriam-webster.com/dictionary/imminent?src=search-dict-box (last visited Feb. 21, 2025). The inclusion of "occurrence" clearly indicates that the Legislature did not intend to limit public health emergencies to events that are "imminent"; by the disjunctive use of those terms, a public health emergency may be either *happening currently* or *happening soon*. We recognize "imminent" occurs twice in Section 12-10A-3(G), but the second use modifies "threat of substantial harm." In other words, the Legislature's pairing of "occurrence" and "imminent" provides little limitation as to the timing of a public health emergency: a public health emergency can be an *ongoing event* that gives rise to an imminent threat of substantial harm or an *event that is happening soon* that gives rise to an imminent threat of substantial harm.

{36} We need not construe "imminent threat of exposure to" further in this context,

22

as the parties do not contest that gun violence and drug abuse were happening at the time of their declaration as public health emergencies. Nonetheless, we note the absence of clarifying language for *how soon* a threat of exposure would have to materialize to qualify as *imminent*. The Legislature employed the temporal phrase "imminent threat of exposure to" in Section 12-10A-3(G) without obvious restriction on a governor's discretion to determine that a threat is *happening soon* or *menacingly near*.

{37} Second, "condition" and "agent" are broad terms in their ordinary and plain meaning, such that many risks of harm to the public could qualify as "extremely dangerous condition[s] or [] highly infectious or toxic agent[s]." Section 12-10(A)-3(G). Applying dictionary definitions relevant to their usage, *condition* commonly means "a state of being," and *agent* commonly means "something that produces or is capable of producing an effect: an active or efficient cause."[15] *Condition* and

---

[15]We note that the Legislature has used the term "condition" to cover a wide variety of circumstances. These include dangerous conditions created by "large amounts of forest undergrowth" which posed a risk "of catastrophic fires," NMSA 1978, § 4-36-11 (2001); highway conditions that "present[] a substantial danger to vehicular travel by reason of storm, fire, accident, spillage of hazardous materials or other unusual or dangerous conditions," NMSA 1978, § 66-7-11 (2007); "conditions within a food service establishment [that] present a substantial danger of illness, serious physical harm or death to consumers," NMSA 1978, § 25-1-9 (1977); the "dangerous condition" of an elevator or other conveyance as determined by an inspector, NMSA 1978, § 60-13B-11(E) (2023, effective July 1, 2025); and the "dangerous condition" of "any mine or portion of a mine or machine, device,

23

*Agent*, Merriam-Webster's Collegiate Dictionary (11th ed. 2005). Again, the Legislature elected to use broad terms for the *cause* or *basis* of a public health emergency without adding clarifying or narrowing language. While "extremely" and "highly" are qualifiers that offer some clarity as to the requisite *degree of seriousness* of a threat, the statute does not further clarify the *kind* or *form* of a qualifying threat.

{38}    Importantly, the Legislature did clarify that qualifying conditions or agents "includ[e] a threatening communicable disease." Section 12-10(A)-3(G). This phrase makes clear that public health emergencies are not limited in kind or form to communicable diseases. *Cf. Wichita Ctr. for Graduate Med. Educ., Inc. v. United States*, 917 F.3d 1221, 1224 (10th Cir. 2019) ("The word 'includes' indicates that the enumerated entities are not exclusive but only illustrative of a broader application."); *see also Wilson*, 2021-NMSC-022, ¶ 67 ("A statute must be construed so that no part of the statute is rendered surplusage or superfluous." (text only) (citation omitted)).

{39}    Third, an "imminent threat of substantial harm" under Section 12-10A-3(G) need only threaten "*any portion*" of "the population of New Mexico." (Emphasis added.) In the absence of clarification by the Legislature, this plain language

---

apparatus or equipment pertaining to a mine" which is created "from any cause," NMSA 1978, § 69-5-14 (2007).

supports that the number of persons threatened by an imminent threat could be quite limited and still qualify as a public health emergency under the PHERA.

{40}     Turning to the plain language of Section 12-10A-5(B)(1) and (3), the statute requires that a governor's declaration merely "specifies . . . the nature of the public health emergency" and "the conditions that caused" it. "Nature" is relevantly defined as "the inherent character or basic constitution of a person or thing." *Nature*, Merriam-Webster's Collegiate Dictionary (11th ed. 2005). Thus, these PHERA provisions require some explanation to the public as to the *character or basic constitution* of the occurrence or imminent threat and the circumstances that lead to it. However, in the absence of more stringent requirements, this statutory language establishes a relatively low bar for a governor to sufficiently justify or explain the initiation of a declared public health emergency.

{41}     In sum, the plain language of Section 12-10A-3(G) and Section 12-10A-5(B)(1) and (3) supports that the Legislature intended for the PHERA to be a broad statute under which the executive can declare and address crises of different form and scope as public health emergencies. *See Romero*, 2021-NMSC-009, ¶ 34 ("[I]t was appropriate for the Legislature to grant the executive branch ample authority to immediately and flexibly respond to a public health emergency.").

{42}    Applied here, the declarations in EO 2023-130 and EO 2023-132 satisfy the plain language of Section 12-10A-3(G) and Section 12-10A-5(B)(1) and (3). Pursuant to Section 12-10A-3(G), the EOs establish that gun violence and drug abuse are currently occurring, which the parties do not contest; provide statistics of death and other serious effects supporting gun violence as an "extremely dangerous condition" and drug abuse as a "highly infectious or toxic agent"; and cite recent cases, statistical trends, and national rates of death and other effects supporting that gun violence and drug abuse each "pose[] an imminent threat of substantial harm to [portions of] the population of New Mexico" warranting immediate response. Pursuant to Section 12-10A-5(B)(1), both EOs certainly specify the *nature* of the purported public health emergencies: as related above, EO 2023-130 includes statistical trends, recent cases, and collateral effects of "gun-related deaths and injuries" warranting emergency response, while EO 2023-132 includes similar information about the nature of drug abuse. Notably, both EOs specify that these problems have a particular impact on young New Mexicans. *See* EO 2023-130 ("[G]uns are the leading cause of death among children and teens in New Mexico."); EO 2023-132 ("[C]hildren and youth of New Mexico are particularly vulnerable to the negative impacts of drug abuse."). Regarding Section 12-10A-5(B)(3), the

causes of the purported public health emergencies are inherent throughout the EOs: the prevalence of guns and drugs.

{43}     In sum, the emergency orders are consistent with the plain language of the PHERA regarding declaration of a public health emergency.

**2.     The emergency orders are consistent with legislative intent underlying the PHERA**

{44}     As discussed above, while Petitioners expressly assert that gun violence and drug abuse are not statutory public health emergencies, they do not articulate a plain language challenge under the PHERA. Instead, we understand Petitioners' argument here to be rooted in policy, asserting that the Court should not adopt a reading of Section 12-10A-3(G) which would allow a governor "to predicate the arrogation of emergency powers on such an open-ended conception of 'public health [emergency].'" Therefore, Petitioners appear to argue that this Court should require every public health emergency (1) to meet the same level of evidentiary support we noted in *Reeb* and *Romero* regarding COVID-19, that scientific consensus establishes the threat is highly contagious and potentially fatal, and (2) to be sudden or unforeseen. Since neither is a requirement within the plain language of Section 12-10A-3(G), Petitioners' statutory argument can only avail under a further analysis of legislative intent.

27

{45} Under our canons of construction, we analyze legislative intent only "[i]f statutory language is doubtful, ambiguous, or an adherence to the literal use of the words would lead to injustice, absurdity, or contradiction." *Vest*, 2021-NMSC-020, ¶ 21 (internal quotation marks and citation omitted). Nothing in Petitioners' petition or reply points to the statutory language itself being doubtful or ambiguous. Applying *Vest*, we construe Petitioners' policy-based argument to suggest that legislative intent would be violated if this Court does not apply Petitioners' proposed requirements to gun violence and drug abuse, resulting in injustice, absurdity, or contradiction. *Cf. State v. Montano*, 2024-NMSC-019, ¶ 20, 557 P.3d 86 ("[T]he absurdity doctrine applies when the literal application of a statute results in an absurdity that the Legislature could not have intended." (internal quotation marks and citation omitted)). Without such a showing, Petitioners' proposed requirements for reading Section 12-10A-3(G) have no basis in law.

a. **Petitioners do not show that requiring a public health emergency to meet the evidentiary standard in *Reeb* and *Romero* is necessary for the emergency orders to abide with legislative intent underlying the PHERA**

{46} Regarding their first proposed requirement, Petitioners point to the evidence in *Reeb* and *Romero* as including "scientific consensus" that COVID-19 is a "highly contagious and potentially fatal disease" which had resulted in millions of cases and hundreds of thousands of deaths across the United States." *Romero*, 2021-NMSC-

28

009, ¶¶ 2-7 (internal quotation marks and citation omitted); *Reeb*, 2021-NMSC-006, ¶¶ 22-23 (internal quotation marks and citation omitted). Petitioners argue that gun violence and drug abuse have "no comparable 'scientific consensus,' and none is proposed in either [executive] order." In contrast to our judicial notice in *Reeb* and *Romero* of COVID-19's contemporaneous and specific threat to the public health, Petitioners point in EO 2023-130 to "five-year-old statistics about 'the rate of gun deaths' . . . and five instances of gun violence in 2023", and in EO 2023-132 to "a 'trend of drug abuse,' including an 'increase in drug-related deaths,' as well as the 'social and economic burdens of drug addiction.'" Petitioners suggest that the factual support in EO 2023-130 and EO 2023-132 is insufficient compared to the *Reeb-Romero* standard, as "[n]either [EO] involves 'address[ing] the spread of an infectious disease through vaccination, isolation and quarantine of persons'" and gun violence and drug abuse "are easily distinguishable from the growing infection and mortality figures of the 'highly contagious and potentially fatal' COVID-19 pandemic." *See Romero*, 2021-NMSC-009, ¶¶ 2-7 (internal quotation marks and citation omitted); *Reeb*, 2021-NMSC-006, ¶¶ 22-23, 26 (internal quotation marks and citation omitted). In short, Petitioners suggest that the evidentiary support required by the PHERA must include a high degree of specificity of threatened harm and scientific consensus based on contemporaneous data.

{47} Petitioners succeed in distinguishing the evidence in the challenged executive orders from that in *Reeb* and *Romero*, but they do not establish that the executive orders as an evidentiary basis for a public health emergency violate the intent of the Legislature. Nothing in *Reeb* or *Romero* announced a new standard for Section 12-10A-3(G) for all future purported public health emergencies, and Petitioners cite no authority suggesting that the evidence in EO 2023-130 and EO 2023-132 would offend legislative intent for declaration of a public health emergency.

{48} To the contrary, indicators of legislative intent behind the PHERA support the conclusion that the Legislature meant to delegate considerable authority and discretion to the executive branch to declare a public health emergency. First, our precedent interpreting legislative intent has consistently interpreted the PHERA, a "statute[] enacted for the protection and preservation of public health," liberally in order "to accomplish and maximize [its] beneficent objectives." *Reeb*, 2021-NMSC-006, ¶ 27 (internal quotation marks and citation omitted) ("Legislation enacted to alleviate grave conditions which result from public calamity deserves a generous interpretation so its remedial purposes may be accomplished." (text only) (citation omitted); "[W]e liberally construe Petitioners' authority under the PHERA to enable the Secretary of Health and others to manage and coordinate a response to a public health emergency such as the COVID-19 pandemic."); *see also Romero*, 2021-

30

NMSC-009, ¶ 30 (reaffirming *Reeb*'s principle of liberal construction); *Wilson*, 2021-NMSC-022, ¶ 41 (same).

{49} Additionally, we relevantly approved in *Romero* that "agencies and individuals with important responsibilities must have *considerable* discretion in order to fulfill their responsibilities effectively. Inadequate discretion probably is a larger problem than excessive discretion." 2021-NMSC-009, ¶ 30 (text only) (citation omitted). Under this principle, the Legislature presumably intended to grant a governor the authority to determine when an occurring or imminent event gives rise to an imminent threat of substantial harm that warrants declaration of a public health emergency. Significantly, this reading also harmonizes with the stated purposes of the PHERA, to:

> A. provide the state of New Mexico with the ability to manage public health emergencies in a manner that protects civil rights and the liberties of individual persons;
>
> B. prepare for a public health emergency; and
>
> C. provide access to appropriate care, if needed, for an indefinite number of infected, exposed or endangered people in the event of a public health emergency.

Section 12-10A-2.

{50} These indicators of legislative intent generally support a broad reading of the PHERA rather than a restrictive bar for sufficient evidence of a public health

emergency. Petitioners point only to our analysis of COVID-19 in *Reeb* and *Romero*, without demonstrating those cases set an evidentiary standard that must be matched in order to abide with the intent of the Legislature. Thus, Petitioners fail to show that this Court should hold gun violence and drug abuse to their proposed evidentiary requirement for public health emergencies under the PHERA.

**b.      Petitioners do not show that requiring a public health emergency to be sudden or unforeseen is necessary for the emergency orders to abide with legislative intent for the PHERA**

{51}     Regarding their second proposed requirement, Petitioners rely on legal definitions of "emergency" to argue that a "public health emergency" must be either "sudden" or "unforeseen." Petitioners also point to *Romero* for the proposition that "an emergency order is 'appropriate' when legislative action is 'facially unworkable.'" *See Romero*, 2021-NMSC-009, ¶ 34. Under these propositions, Petitioners reject Respondents' reading of Section 12-10A-3(G) as "not requir[ing] that the prompting threat was either sudden or unforeseen; more significantly, it would extend the Governor's power to include even those circumstances that *do* present time for full deliberation by the Legislature and in which statutory solutions would thus be workable." (internal quotation marks and citations omitted). As above, Petitioners contend that adopting Respondents' reading "is to presume a state of perpetual emergency."

{52}    As cited by Petitioners, we recognize the relevance here of the general concept of *emergency*, as the PHERA exists within the larger statutory context of the Emergency Powers Code (the Code). *See Key v. Chrysler Motors Corp.*, 1996-NMSC-038, ¶ 14, 121 N.M. 764, 918 P.2d 350 ("[A]ll parts of a statute must be read together to ascertain legislative intent[,]" and "[w]e are to read the statute in its entirety and construe each part in connection with every other part to produce a harmonious whole." (citations omitted)); *see also* § 12-9B-1 ("Chapter 12, Articles 10, 10A, 11[,] and 12 NMSA 1978 may be cited as the 'Emergency Powers Code.'"); Chap. 12, Art. 10 ("All Hazard Emergency Management"); Chap. 12, Art. 10A-1 to -19 (the PHERA)); Chap. 12, Art. 11 ("Disaster Acts"); Chap. 12, Art. 12 ("Hazardous Materials Emergency Response"). However, the Code does not provide a statutory definition of *emergency*, nor does the Code set relevant requirements to be applied across its varied statutory sections. Further, common dictionary definitions of "emergency" do not present a consensus that "sudden" and "unforeseen" are elemental requirements for that general term. *See Emergency*, Merriam-Webster Collegiate Dictionary (11th ed. 2005) ("(1) an unforeseen combination of circumstances or the resulting state that calls for immediate action; (2) an urgent need for assistance or relief.").

33

{53} Regardless, within the PHERA the Legislature has provided a more specific term and definition of *public health emergency*, which counsels for that term's prevailing importance. *See State v. Santillanes*, 2001-NMSC-018, ¶ 7, 130 N.M. 464, 27 P.3d 456 ("Under [the general/specific rule of statutory construction], if two statutes dealing with the same subject conflict, the more specific statute will prevail over the more general statute absent a clear expression of legislative intent to the contrary." (citation omitted)). In sum, Petitioners' cited definitions of *emergency* do not create a basis for adding language to the Legislature's definition of *public health emergency*.

{54} Petitioners do not otherwise carry their burden to show that requiring a public health emergency to be sudden or unforeseen is necessary to abide with legislative intent. First, the Legislature has provided a statutory definition of "public health emergency," and we are bound by it. *See, e.g.*, *Morris v. Brandenburg*, 2016-NMSC-027, ¶ 15, 376 P.3d 836 ("Unless it would lead to an unreasonable result, we regard a statute's definition of a term as the Legislature's intended meaning." (citation omitted)). Second, *sudden* and *unforeseen* are retrospective terms, looking backwards into the circumstances giving rise to the threat, whereas the Legislature has defined a public health emergency in terms of an "imminent threat," a prospective definition that looks ahead to the nature of the impending danger. This

34

further erodes any claim that a *sudden or unforeseen* requirement would reflect legislative intent. Third, Petitioners do not explain why a *preexisting* condition or agent that rises to an extremely dangerous or highly infectious level—that is, a serious threat to the public health requiring immediate response but not necessarily sudden or unforeseen in nature—would be less deserving as a public health emergency in the view of the Legislature than a *novel* or *unexpected* condition or agent. Stated differently, Petitioners offer no argument that the Legislature intended for a governor *not* to be able to declare and address a public health emergency when a proper crisis arises *gradually* and *foreseeably*, such as substantial harm to the public from persistent drought or flu. Fourth, Petitioners offer no argument showing a *sudden or unforeseen* requirement would not itself constitute an unclear test for a public health emergency.

{55} Additionally, Petitioners misrepresent our proposition in *Romero*: in recognizing that use of special sessions of the Legislature in lieu of executive emergency orders is facially unworkable, we did not suggest that such orders are *only* appropriate when government faces a sudden or unforeseen circumstance. Petitioners relatedly argue "it is the Legislature's inability to address a threat quickly enough that justifies the[] temporary delegations" of emergency police powers. For support, Petitioners cite a comparison of Article IV, Section 2 of the New Mexico

35

Constitution ([Legislative] Powers generally; disaster emergency procedure) with Article V, Section 4 (Governor's executive power; commander of militia), but Petitioners offer no construction of these constitutional provisions supporting their argument.

{56}    Finally, we address Petitioners' legitimate concern that a governor could abuse the PHERA to declare "a state of perpetual emergency" in the absence of a sudden or unforeseen requirement. Critically, however, Petitioners conflate the issue of a public health emergency's *initiation or declaration* with its *termination or duration*. Our discussion thus far establishes by analysis of plain language and legislative intent that the Legislature granted considerable authority and discretion to a governor to determine and declare in the first instance that a public health emergency exists. Petitioners' sudden-and-unforeseen requirement would restrict that authority and discretion but would have doubtful relevance to when a declared public health emergency ends. Logically, any public health emergency could be challenged as to whether the conditions justifying its declaration remained in existence, regardless of whether those initiating conditions manifested suddenly or gradually, foreseeably or otherwise. Accordingly, Petitioners' argument as to the potential abuse of the PHERA does not establish a policy need for their proposed requirement that would support a violation of legislative intent.

**{57}** For the foregoing reasons, Petitioners do not show that the emergency orders declaring and addressing gun violence and drug abuse as public health emergencies exceed the scope of Section 12-10A-3(G).

**{58}** Before we turn to Petitioners' next argument, we briefly address the statutory concerns raised by the dissents, which overlap substantially with Petitioners' arguments already discussed. Respectfully, the dissents do not demonstrate our statutory construction of "public health emergency" misconstrues either the plain language or underlying intent of Section 12-10A-3(G). They similarly do not explain how the EOs here would not qualify even under their construction, where the emergency orders implicitly assert *changed circumstances* regarding gun violence and drug abuse *warranting immediate response*. Given the mandamus posture of this case, the dissents' rejection of the purported public health emergencies here must account for those uncontested facts, given our deferential review of "executive orders issued for the protection of public health during a public health crisis." *Romero*, 2021-NMSC-009, ¶¶ 30, 39-40. Finally, the dissents set requirements for definition and declaration of a public health emergency that do not reside in either statutory language or demonstrated legislative intent.

**F.  Whether the Emergency Orders Constitute an Improper Exercise of the Police Power**

{59}   Having determined that the emergency orders abide under the PHERA, we next consider Petitioners' challenge to those orders as an improper exercise of the police power.

{60}   Petitioners pose such a challenge in multiple portions of their briefing. Pointing to the first Amended PHEO provisions regarding firearm possession, public-school-wastewater testing, and juvenile detention, Petitioners ask us to determine, consistent with *Wilson*, "whether [the first Amended PHEO's] exercise of the police power 'to protect the public health has no real or substantial relation to its stated objects.'" 2021-NMSC-022, ¶ 42 (brackets and ellipsis omitted) (quoting *Jacobson v. Massachusetts*, 197 U.S. 11, 25 (1905)). Petitioners challenge the same three provisions in the first Amended PHEO as improper exercises of the police power in the context of their separation-of-powers challenge and, citing *Jacobson*, challenge the original PHEO's firearm provisions as a "plain, palpable invasion of rights" under the state and federal constitutions. *Jacobson*, 197 U.S. at 31 (internal quotation marks and citations omitted).

{61}   While we deem their challenge under the Second Amendment and Article II, Section 6 of the New Mexico Constitution abandoned, as discussed above, Petitioners have not expressly abandoned their police power assertions regarding the

38

firearm restrictions. Further, the Petition expressly urges that we "decide these issues on the merits regardless of whether the current PHEO is put back into full effect, is voluntarily withdrawn, or is superseded by another order, as the deeper legal issues involved are of paramount importance and are 'capable of repetition yet evading review.'" (quoting *Cobb*, 2006-NMSC-034, ¶¶ 29-32). For these reasons, we do not exclude the first Amended PHEO's firearm possession provision from consideration here.

{62} Petitioners' various challenges summarized above share a common argument that we resolve before considering their separation-of-powers challenge: an assertion that the specified provisions in the emergency orders are an improper exercise of the police power. We address this as a preliminary issue because, as *Jacobson* and other cases make clear, an exercise of the police power is subject to judicial review regardless of whether the wielder of the power is the legislative or executive branch. *See Jacobson*, 197 U.S. at 25, 27, 31 (holding that the Massachusetts legislature was permitted to entrust to local boards of health the decision whether to require the inhabitants of a city or town to be vaccinated against smallpox as "necessary for the public health or the public safety"); *Reeb*, 2021-NMSC-006, ¶¶ 14-16 (examining both legislative and executive actions under the police power). If challenged executive action is determined to be a proper exercise of the police power generally,

then the remaining analysis would include whether the exercise of that power was nonetheless improper under separation-of-powers principles. Thus, analysis of whether the emergency orders abide as a proper exercise of the police power should not be conflated with whether they violate the separation-of-powers doctrine. A threshold determination that those orders exceed the limits of the police power would be dispositive, without the need to address whether the executive's exercise of the police power violates separation of powers.

{63} We have discussed the contours of the police power in *Reeb*, *Romero*, and *Wilson* in the context of a public health emergency. The Legislature's constitutional police power is "the broadest power possessed by governments, to protect public health and welfare," which encompasses "[l]aws providing for preservation of the public peace, health and safety." *Reeb*, 2021-NMSC-006, ¶ 14 (internal quotation marks and citations omitted). "Th[is] power[] must, of course, be delegated or enforced consistent with other constitutional requirements." *Id.*; *see Romero*, 2021-NMSC-009, ¶ 30. Though not defined precisely "beyond a standard of reasonableness," the police power has two essential elements for its proper exercise: "'First, that the interests of the public require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals.'" *Wilson*, 2021-NMSC-022, ¶ 22 (ellipsis

40

omitted) (quoting *Goldblatt v. Town of Hempstead, N.Y.*, 369 U.S. 590, 594-95 (1962)). Stated differently as applicable here, we must assess "whether the crisis or emergency upon which the executive bases its exercise of police power is legitimate and whether the executive action is reasonably related to the response to the asserted crisis or emergency," *Romero*, 2021-NMSC-009, ¶ 55 (Thomson, J., specially concurring) (citing *Mitchell v. City of Roswell*, 1941-NMSC-007, ¶ 13, 45 N.M. 92, 111 P.2d 41; *Jacobson*, 197 U.S. at 31), as well as whether that action constitutes "beyond all question, a plain, palpable invasion of rights secured by the fundamental law,"[16] *Jacobson*, 197 U.S. at 31.

{64}     We consider first whether gun violence and drug abuse are legitimate crises or emergencies upon which to base the Governor's exercise of the police power. Our precedent makes clear that any subject may be a legitimate focus for use of the police

---

[16]As we discussed in *Romero* and *Pirtle*, *Jacobson* remains good law in defining the scope of judicial scrutiny of emergency public health laws, though we also noted an unsettled question as to how *Jacobson*'s deferential review of state action for the protection of the public health abides with the subsequent development of tiered levels of scrutiny. *See Romero*, 2021-NMSC-009, ¶ 40 ("Undoubtedly, given that *Jacobson* was decided well before the development of modern American constitutional jurisprudence, some would give its holding a narrow application."); *Pirtle*, 2021-NMSC-026, ¶ 37 (*Jacobson*'s "deferential police power review standard remains relevant today, save arguably in the context of free-exercise-of-religion cases."). However, because we need not scrutinize this case under the Second Amendment or other fundamental law, as we discuss further below, "this case does not require us to decide *Jacobson*'s outer limits." *Romero*, 2021-NMSC-009, ¶ 40 n.23.

41

power so long as that subject relates to the public health, safety, or welfare. *E.g.*, *Colinas Dev. Council v. Rhino Env't. Servs., Inc.*, 2005-NMSC-024, ¶ 15, 138 N.M. 133, 117 P.3d 939 (recognizing the purposes of the Solid Waste Act, NMSA 1978, § 74-9-2(C) (1990), include "protect[ing] the public health, safety[,] and welfare"); *Santa Fe Cmty. Sch. v. State Bd. of Educ.*, 1974-NMSC-005, ¶ 7, 85 N.M. 783, 518 P.2d 272 (recognizing that supervision and control of private schools may be conferred to the Board of Education under the police power); *State ex rel. N.M. Dry Cleaning Bd. v. Cauthen*, 1944-NMSC-047, ¶ 18, 48 N.M. 436, 152 P.2d 255 (upholding dry cleaning as a proper subject of regulation under the police power); *Arnold v. Bd. of Barber Exam'rs*, 1941-NMSC-003, ¶¶ 37-42, 45 N.M. 57, 109 P.2d 779 (upholding regulation of minimum pricing in the barber trade under the police power).

{65}  Considering the undisputed facts in the emergency orders against this backdrop, the effects of gun violence and drug abuse on New Mexicans involve obvious public health, safety, and welfare implications. For example, as discussed above, EO 2023-135 states "the rate of gun deaths in New Mexico increased 43% from 2009 to 2018, compared to an 18% increase over this same time period nationwide." EO 2023-136 cites "a significant increase in drug-related deaths, with 1,501 fatal overdoses reported in the state in 2021—the fifth highest overdose rate

42

in the nation." Petitioners relevantly concede that "substance abuse or firearm deaths are [] serious issues" and present no argument that these serious issues do not comport with the scope of the police power. Thus, we conclude that gun violence and drug abuse are legitimate subjects for exercise of the police power.

{66}     We consider next whether the emergency measures in the first Amended PHEO relating to firearm possession, public-school wastewater testing, and suspension of JDAI are reasonably related to those legitimate subjects. Our jurisprudence makes two relevant propositions clear: our reasonableness standard is deferential to measures intended to protect the public health, and a petitioner in this posture bears the burden to show the absence of a reasonable relationship between means and ends. *See Mitchell*, 1941-NMSC-007, ¶¶ 13-14 ("It is the policy of the courts to uphold regulations intended to protect the public health, unless it is plain that they have no real relation to the object for which ostensibly they were enacted, and prima facie they are reasonable. . . . The[] findings [of the city governing board] and the enactment of the [nuisance] ordinance, established prima facie that it was reasonable, and burdened plaintiffs with the necessity of disproving it." (citations omitted)); *Cauthen*, 1944-NMSC-047, ¶ 18 (holding that, absent a claimant's proof otherwise, an act in the interest of the public health and safety will be sustained under "the presumption of constitutionality"); *cf. State v. 44 Gunny Sacks of Grain*, 1972-

43

NMSC-033, ¶ 9, 83 N.M. 755, 497 P.2d 966 ("The right to seize and destroy unfit or impure foods is a reasonable exercise of the right and duty of the State to protect the public health and is predicated upon the police power." (citation omitted)).

{67}  Petitioners argue briefly and generally that the emergency orders do not explain how the relevant measures reasonably relate to their stated ends. Regarding wastewater testing and suspension of JDAI, Petitioners also argue the absence of a reasonable relationship where the relevant EO's only statement on children and youth is that they "are particularly vulnerable to the negative impacts of drug abuse, as evidenced by the rising number of cases involving *parental* substance abuse and its subsequent effect on child welfare." EO 2023-132 (emphasis added). Petitioners note that "parental conduct is not addressed by the measures proposed."

{68}  Section 1 of the first Amended PHEO relevantly prohibits firearm possession in Bernalillo County "either openly or concealed in public parks or playgrounds, or other public area[s] provided for children to play in." To be reasonably related to addressing gun violence, this emergency measure "must have some fair tendency to accomplish, or aid in the accomplishment of," that legitimate police power purpose. *Welch v. Swasey*, 214 U.S. 91, 105 (1909). As above, EO 2023-135 states "guns are the leading cause of death among children and teens in New Mexico" and cites relevant deaths of thirteen-, five-, and eleven-year-old victims. Against this factual

44

backdrop, we conclude that prohibiting firearm possession from areas frequented by children has some fair tendency to aid in the accomplishment of fewer gunshot-related deaths among children and thus is reasonably related to addressing gun violence as declared and explained in the emergency orders. Our reading of the caselaw above assessing a reasonable relationship of means and ends under the police power requires no more, and Petitioners offer no meaningful argument otherwise.

{69} Because Petitioners do not challenge Section 1 of the first Amended PHEO under the state or federal right to bear arms, we need not consider whether heightened scrutiny should apply due to a purported invasion of "fundamental law." *Jacobson*, 197 U.S. at 31. For completeness, we note that the federal district court rejected a motion for a temporary restraining order against the first Amended PHEO, declaring (1) "this Court [already] enjoined enforcement of the order as it applied to public parks" such that further restraint of amended Section 1 "would be superfluous and unnecessary" and (2) under *Bruen*, the plaintiffs there failed to show a likelihood of success on the merits regarding playgrounds and other areas where children play. *We the Patriots, Inc. v. Grisham*, 1:23-CV-00773-DHU-LF at *2-3 (D.N.M. Sept. 29. 2023); *see We the Patriots, Inc.*, 697 F. Supp. 3d 1222, 1237 (D.N.M. Oct. 11, 2023) ("[U]nder *Bruen*, the [c]ourt 'can assume it settled' that playgrounds are a

45

'sensitive place.'" (citing *New York State Rifle and Pistol Ass'n v. Bruen*, 597 U.S. 1, 30 (2022))). We read the federal district court's ruling as supporting that the firearm restrictions in the first Amended PHEO are not unreasonable.

{70} Section 4 of the first Amended PHEO relevantly requires the DOH and the New Mexico Environmental Department to "develop a program to conduct wastewater testing for illicit substances, such as fentanyl, at all public schools." To be reasonably related to its end under *Welch*, this emergency measure "must have some fair tendency to accomplish, or aid in the accomplishment of," addressing drug abuse. 214 U.S. at 105. As above, EO 2023-136 cited "a significant increase in drug-related deaths, with 1,501 fatal overdoses reported in the state in 2021—the fifth highest overdose rate in the nation." EO 2023-136 also cites "the accessibility and prevalence of potent synthetic opioids, such as fentanyl, [which] have escalated the risks associated with drug abuse, contributing to a surge in overdose incidents." Nothing in EO 2023-136 suggests that school-age New Mexicans are excluded from these effects. In combination with EO 2023-136's factual assertion that "the children and youth of New Mexico are particularly vulnerable to the negative impacts of drug abuse," it is a reasonable inference that testing wastewater from schools could provide relevant information as to just how *accessible* and *prevalent* certain substances are among school-age New Mexicans. Logically, acquiring such

information could be useful to the executive branch in coordinating a response to drug abuse, at least as it relates to that age classification. Consequently, the facts in the emergency orders support that wastewater testing for illicit substances at all public schools is reasonably related to addressing drug abuse.

{71} Petitioners here simply argue that the emergency orders fail to explain how testing "public-school sewage" relates to reducing drug abuse when the particular vulnerability of children and youth cited in EO 2023-136 regards *parental* substance abuse and its subsequent effect on child welfare. However, as above, the factual explanation in EO 2023-136 includes information relating to the nature of drug abuse in New Mexico generally, and Petitioners provide no evidence establishing that school-age New Mexicans are excluded. Importantly here, Petitioners bear the burden to show the *absence* of a reasonable relationship between wastewater testing of public schools and addressing drug abuse, and our reasonableness standard is deferential so long as we have sufficient information to logically arrive at the *presence* of such.

{72} Section 5 of the first Amended PHEO relevantly requires CYFD to "immediately suspend [JDAI] and evaluate juvenile probation protocols." To be reasonably related to its end under *Welch*, this emergency measure "must have some fair tendency to accomplish, or aid in the accomplishment of," addressing gun

47

violence or drug abuse. 214 U.S. at 105. Petitioners argue that the emergency orders fail to explain how "suspending alternatives to locked detention for children relates *either* to reducing gun violence *or* drug abuse." We agree.

{73} We take judicial notice that, prior to the emergency orders, JDAI has been a juvenile justice reform initiative within CYFD that includes risk assessment for youth referred to detention. *See* "New Mexico Juvenile Justice Services Fiscal Year 2022" at 29-30[17]; *see also* "Juvenile Detention Alternatives Initiatives (JDAI) in New Mexico,"[18] ("JDAI was designed to support the [Annie E.] Casey Foundation's vision that all youth involved in the juvenile justice system have opportunities to develop into healthy, productive adults."); *Romero*, 2021-NMSC-009, ¶ 7 ("This Court may, on its own, 'judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'"(quoting Rule 11-201(B), (C) NMRA)). CYFD has described the objectives of JDAI include reducing the juvenile population

[17]*See* New Mexico Juvenile Justice Services Fiscal Year 2022, https://www.cyfd.nm.gov/wp-content/uploads/2024/01/SFY-2022-Annual-Report_ Melissa-Gomez.pdf (last visited Feb. 6, 2025).

[18]*See* Juvenile Detention Alternatives Initiatives (JDAI) in New Mexico, https://www.nmlegis.gov/handouts/CCJ%20092514%20Item%205%20Juvenile%2 0Detention%20Alternatives.pdf (last visited Feb. 6, 2025).

in New Mexico's detention facilities. *See* "Juvenile Detention Alternatives Initiatives (JDAI) in New Mexico" at 3.

{74} The emergency orders offer no explanation as to which declared public health emergency—gun violence or drug abuse—is meant to be addressed by the suspension of JDAI or CYFD's evaluation of juvenile probation protocols, nor do the emergency orders explain what results are expected. Without resorting to conjecture, we have no basis from which to infer that Section 5 has some fair tendency to accomplish, or aid in the accomplishment of, remedying either of the declared public health emergencies. Even with the deference our precedent demands, we cannot conclude Section 5 of the first Amended PHEO is reasonably related to a legitimate end under the police power. Accordingly, we will issue the writ as regards the analogous provision in the current PHEO: Section 4 of the second Amended PHEO is identically worded.

{75} We emphasize our determination does not create an affirmative duty on the executive branch to issue explanations of emergency orders to a specified standard. Our precedents above establish that we will infer a reasonable relationship between means and ends in this context where the facts before us so support. In this instance, the Secretary may possess a valid rationale for the relevant provision which would

49

demonstrate a reasonable relationship between the measure and either or both of the declared public health emergencies, but that support is not currently before us.

{76}    We also note without deciding that suspension of JDAI may not require emergency action. The underlying premise to Petitioners' police power challenge is that the emergency measures require exercise of that power, but we find no evidence JDAI's status extends beyond an initiative within CYFD subject to executive discretion.[19]

{77}    In summary, we hold Sections (1) and (4) of the first Amended PHEO are valid exercises of the police power, and so we consider below whether those sections violate separation of powers. Section (5), however, fails as an exercise of the police power under the reasonable relationship prong, and we will issue the writ to bar its enforcement pursuant to the emergency orders.

---

[19]Relatedly, we are not convinced that other provisions of the first Amended PHEO challenged within Petitioners' separation-of-powers arguments require authorization under PHERA, including Section 2 (monthly inspections of licensed firearms dealers), Section 3 (comprehensive report on gunshot victims (omitted in the second Amended PHEO)), and Section 4 (public-school wastewater testing). As with suspension of JDAI, whether a public health emergency is a prerequisite for such executive action is not before us.

**G. Whether the Emergency Orders Violate Separation-of-Powers Principles**

{78} Next, we address whether the emergency orders constitute a violation of separation of powers under Article III, Section 1 of the New Mexico Constitution, which provides:

> The powers of the government of this state are divided into three distinct departments, the legislative, executive[,] and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments, shall exercise any powers properly belonging to either of the others, except as in this constitution otherwise expressly directed or permitted.

{79} Petitioners present three arguments supporting their claim that the emergency orders constitute a separation-of-powers violation. First, citing *Romero*, they argue that "the orders encroach on areas reserved to the Legislature." Second, they argue that the Legislature could not delegate to the Governor legislative powers "even if it wished to." Third, they argue that "[t]he Governor's lawmaking infringes on existent statutory schemes in the furtherance of long-term policy goals." Because their first and third arguments relate to the same statutory schemes, we address Petitioners' encroachment and infringement assertions in turn, then consider Petitioners' nondelegation argument.

**1. Applicable law for Petitioners' separation-of-powers challenges**

{80} "The doctrine of separation of powers rests on the notion that the accumulation of too much power in one governmental entity presents a threat to

51

liberty." *State ex rel. Clark v. Johnson*, 1995-NMSC-048, ¶ 31, 120 N.M. 562, 904 P.2d 11; *see also Bd. of Educ. of Carlsbad Mun. Schs. v. Harrell*, 1994-NMSC-096, ¶ 42, 118 N.M. 470, 882 P.2d 511 ("'The accumulation of all powers, legislative, executive, and judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny.'" (quoting *The Federalist* No. 47 (James Madison)). Accordingly, we will not hesitate to give effect to Article III, Section 1 of the New Mexico Constitution by "interven[ing] when one branch of government unduly interfere[s] with or encroache[s] on the authority or within the province of a coordinate branch of government." *Clark*, 1995-NMSC-048, ¶ 32 (internal quotation marks and citation omitted).

{81} Notwithstanding the importance of this bedrock principle in our democratic system, we have also recognized that "the constitutional doctrine of separation of powers allows some overlap in the exercise of governmental function." *Id.* (text only) (citation omitted). "[N]either desirable nor realistic," *id.*, the "[t]otal compartmentalization and separation of functions between the executive and legislative branches would result in a state of dysfunction." *Candelaria*, 2023-NMSC-031, ¶ 14. "Our approach is one of practicality and common sense, which recognizes that although the executive, legislative, and judicial powers set out in our

Constitution are not hermetically sealed, they are nonetheless functionally identifiable one from another." *Id.* (text only) (citation omitted).

{82} "Within our constitutional system, each branch of government maintains its independent and distinct function." *Taylor*, 1998-NMSC-015, ¶ 21. We have recognized the distinct and proper roles of the legislative and executive branches, respectively, as making law and executing law. *See Clark*, 1995-NMSC-048, ¶ 33; *see also Unite New Mexico*, 2019-NMSC-009, ¶ 8 ("[T]he right to determine what the law shall be. . . . is a function which the Legislature alone is authorized under the Constitution to exercise." (internal quotation marks and citation omitted)); *Taylor*, 1998-NMSC-015, ¶ 21 ("[O]nly the legislative branch is constitutionally established to create substantive law."). "It is the particular domain of the [L]egislature, as the voice of the people, to make public policy. Elected executive officials and executive agencies also make policy, but to a lesser extent, and only as authorized by the constitution or [L]egislature." *Id.* (text only) (internal quotation marks omitted).

{83} "'In determining whether [a government action] disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which the action by one branch prevents another branch from accomplishing its constitutionally assigned functions.'" *Clark*, 1995-NMSC-048, ¶ 34 (quoting *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 443 (1977)). "If a governor's actions infringe

upon the essence of legislative authority—the making of laws—then the governor has exceeded [their] authority." *Taylor*, 1998-NMSC-015, ¶ 24 (internal quotation marks and citation omitted); *cf. State ex rel. Schwartz v. Johnson*, 1995-NMSC-080, ¶ 16, 120 N.M. 820, 907 P.2d 1001 ("The legislative responsibility to set fiscal priorities through appropriations is totally abandoned when the power to reduce, nullify, or change those priorities is given over to the total discretion of another branch of government." (internal quotation marks and citation omitted)).

{84} As the parties here agree and we discuss further below, "[t]he operative question is whether the [emergency orders] disrupt[] the proper balance between the executive and legislative branches and infringe[] on the legislative branch by, for instance, imposing through executive order substantive policy changes in an area of law reserved to the Legislature." *Romero*, 2021-NMSC-009, ¶ 34 (internal quotation marks and citation omitted). For the reasons that follow, we determine that Petitioners have not shown that the emergency orders disrupt that proper balance of power.

**2.     Petitioners do not show that the emergency orders either unconstitutionally encroach on areas of law reserved to the Legislature or constitute "lawmaking" to infringe the Legislature's role and function**

{85}     To support their encroachment and infringement arguments, Petitioners point to statutory schemes which they assert have been improperly "contradict[ed]" and "overrid[den]" by the emergency measures in the first Amended PHEO.

{86}     Petitioners first point to the first Amended PHEO's restrictions on firearm possession in specified public areas. Petitioners suggest these restrictions encroach on the Legislature's exercises of the police power regarding the Concealed Handgun Carry Act, NMSA 1978, §§ 29-19-1 to -15 (2003, as amended through 2015), and regulation of carrying a deadly weapon, NMSA 1978, §§ 30-7-1 to -16 (1963, as amended through 2024). Where Respondents analogize playgrounds to schools, Petitioners also suggest the first Amended PHEO's restrictions infringe on the Legislature's definition of "school premises" in Section 30-7-2.1(B)(1)-(2).

{87}     Next, Petitioners point to the first Amended PHEO's provision requiring "a program to conduct wastewater testing for illicit substances, such as fentanyl, at all public schools." Petitioners suggest this provision encroaches on the Legislature's function to regulate controlled substances and determine whether a drug is *illicit*, citing portions of the Controlled Substances Act, §§ 30-31-1 to -41 (1972, as amended through 2022). Petitioners also suggest the first Amended PHEO's

55

wastewater testing provision infringes on the Legislature's policy choice in Section 30-31-40(B), which protects "the names and other identifying characteristics of individuals who are subjects of [controlled substances] research."

{88} Next, Petitioners point to the first Amended PHEO's suspension of JDAI. Petitioners suggest this suspension encroaches on the Legislature's establishment in NMSA 1978, § 9-2A-14.1 (2007) of the juvenile continuum grant fund and contradicts the Legislature's purpose in NMSA 1978, § 32A-2-2(H) (2007) of the Delinquency Act "to develop community-based alternatives to detention." Petitioners also cite Section 32A-2-2(H) to suggest the suspension of JDAI infringes the Legislature's lawmaking power.

{89} Lastly, Petitioners point to the first Amended PHEO's requirement that DOC and DHS "provide assistance" to MDC "to ensure adequate staffing, space, and screening for arrested and incarcerated individuals." Petitioners suggest this requirement encroaches on the Legislature's exercise of the police power to regulate jails in NMSA 1978, §§ 33-3-1 to -28 (1959, as amended through 2023), including by "effectively mandat[ing] an agreement between MDC and other agencies . . . while sidestepping the requirements and checks" in Section 33-3-2(A), (D). Petitioners also cite Section 33-3-2(A), (D) to suggest the first Amended PHEO's requirement infringes on the Legislature's lawmaking power.

{90} We next discuss Petitioners' relevant encroachment and infringement positions regarding these statutes.

**a.** **Petitioners do not show that the emergency orders unconstitutionally encroach on or interfere with areas of law reserved to the Legislature**

{91} Quoting *Romero*, Petitioners attempt to characterize all areas of law in which the Legislature has enacted under the police power, including the statutory schemes above, as "area[s] of law reserved to the Legislature." *Romero*, 2021-NMSC-009, ¶ 34 (citation omitted). Under this characterization, Petitioners appear to presume that any action taken by the Governor pursuant to the PHERA "disrupts the proper balance between the executive and legislative branches" if that action at all intersects with existing statutes. *Id.* (internal quotation marks omitted). As we explain below, this characterization misapprehends *Romero* and serves as a false premise for finding that the emergency measures violate Article III, Section 1 of the New Mexico Constitution. Under a proper reading of *Romero*, *Taylor*, and *Clark*, which we provide next, Petitioners fail to show that the emergency orders improperly encroach on areas of law reserved to the Legislature.

{92} In providing the "operative question" embraced by the parties, *Romero* illustrated how a public health order pursuant to the PHERA might unconstitutionally infringe on the legislative branch "by, for instance, imposing through executive order substantive policy changes in an area of law reserved to the

57

Legislature." 2021-NMSC-009, ¶ 34 (citing *Taylor*, 1998-NMSC-015, ¶¶ 24-25). This statement concluded our analysis in *Romero* of whether the Secretary's public health emergency order banning indoor dining—issued pursuant to the PHERA and the police power—was *ultra vires*. *Romero*, 2021-NMSC-009, ¶¶ 4-5, 34. We held it was not, stating that the public health order in question reflected "a collaboration among executive officials, including the Governor, to respond to the [public health emergency], as contemplated under the PHERA." *Id.* ¶ 33. In concluding that the challenged order "d[id] not work a fundamental disruption of the balance of powers between the branches of government," we also noted that "New Mexico ha[d] not entered a 'new normal,' nor d[id] the temporary emergency orders constitute 'long-term policy' decisions." *Id.* ¶ 34. In other words, the Legislature properly retained all of its power to make law in the area affected by the temporary emergency order, and no separation-of-powers violation resulted. Clearly, the Executive's order challenged in *Romero* did not "impos[e] . . . substantive policy changes in an area of law reserved to the Legislature." *Id.* ¶ 34.

{93}     *Taylor* relevantly illuminates the meaning of "reserved to the Legislature." 1998-NMSC-015, ¶¶ 24-25. In *Romero*, this Court cited *Taylor* as a contrasting case in which the proper balance of powers was disrupted by an executive order which "'substantially altered, modified, and extended existing law.'" *Romero*, 2021-

58

NMSC-009, ¶ 34 (quoting *Taylor*, 1998-NMSC-015, ¶ 25). In *Taylor*, the governor's order "effect[ed] an extensive overhaul of the state's public assistance system without legislative participation," and we concluded that his "program implement[ed] the type of substantive policy changes reserved to the Legislature." 1998-NMSC-015, ¶¶ 2, 25. *Taylor* did not suggest that the governor could not exercise lawful discretion in the area of public assistance law, but this Court held the governor's program to be "executive creation of substantive law, and as such, [wa]s an unconstitutional encroachment upon the Legislature's role of declaring public policy." *Id.* ¶ 25. This discussion in *Taylor* reinforces that the constitutional responsibility for creating substantive law and declaring public policy is reserved to the Legislature. *Id.* ¶¶ 24-25.

{94} Also relevant to the meaning of *Romero*, the *Taylor* Court noted that "by refusing to permit legislative participation in fashioning public assistance policy changes, [r]espondents attempt[ed] to foreclose legislative action *in an area where legislative authority is undisputed*." *Taylor*, 1998-NMSC-015, ¶ 25 (emphasis added) (brackets omitted) (citing *Clark*, 1995-NMSC-048, ¶ 34); *see id.* ¶ 24 ("A [separation of powers] violation occurs when the Executive, rather than the Legislature, determines how, when, and for what purpose the public funds shall be applied in carrying on the government." (internal quotation marks and citation

omitted)). Again, the Court did not suggest that the Legislature's authority in this area of law precluded executive discretion in all forms, rather that creation of substantive policy changes in that area was the Legislature's constitutional prerogative and thus "[the governor's] plan required legislative participation." *Taylor*, 1998-NMSC-015, ¶ 49.

{95}   Importantly, *Taylor* rejected the respondents' proposed remedy of corrective legislation in the ensuing session: that is, our rejection was based on such a future Legislature needing a veto-override majority of two-thirds vote to amend the governor's unilaterally implemented public assistance policies. *Id.* ¶¶ 44-48. Stated differently, this scenario of further legislative action to remedy the governor's improper accumulation of power would "turn[] our constitutional system of checks and balances on its head, . . . plac[ing] the Legislature in a position of responding to, rather than initiating, core public policy choices." *Id.* ¶ 48.

{96}   As cited by *Taylor*, *Clark* offers further assistance in understanding *Romero*. In *Clark*, this Court determined that the governor's unilateral entry into tribal gaming compacts and revenue-sharing agreements violated the separation-of-powers doctrine by "contraven[ing] the [L]egislature's expressed aversion to commercial gambling and exceed[ing] his [executive] authority." 1995-NMSC-048, ¶ 37. The *Clark* Court declared "it is undisputed that New Mexico's [L]egislature possesses

60

the authority to prohibit or regulate all aspects of gambling on non-Indian lands." *Id.* ¶ 37. In that context, we recognized that attempting to foreclose legislative action "in areas where legislative authority is undisputed" would constitute a "mark of undue disruption" of the separation of powers, a disruption whereby "one branch prevents another branch from accomplishing its constitutionally assigned functions." *Id.* ¶ 34 (internal quotation marks and citation omitted). Whereas the executive may act in this area of law in accordance with expressed legislative intent, the governor's actions in *Clark* "occurred in the absence of *any* action on the part of the [L]egislature." *Id.* ¶ 36 ("While the [L]egislature might authorize the [g]overnor to enter into a gaming compact or ratify his actions with respect to a compact he has negotiated, the [g]overnor cannot enter into such a compact solely on his own authority."). As in *Taylor*, *Clark* supports that the constitutional role of creating substantive law and public policy belongs to the Legislature, not that the Executive cannot exercise delegated discretion in areas wherein the Legislature has spoken.

{97}     In sum, *Clark* counsels that legislative action cannot be foreclosed by the executive in areas of law wherein legislative authority is undisputed; *Taylor* counsels that executive implementation of substantive policy changes without legislative participation can constitute improper executive creation of substantive law; and, notwithstanding, *Romero* counsels that even in an area of law reserved to the

61

Legislature such as exercise of the police power, an overlapping executive order can abide with the separation-of-powers doctrine. *See Clark*, 1995-NMSC-048, ¶ 32 ("[T]he constitutional doctrine of separation of powers allows some overlap in the exercise of governmental function." (internal quotation marks and citation omitted)). Importantly in *Romero*, the executive order there abided with legislative intent in the PHERA and did not impose substantive policy changes, notwithstanding that the order affected an area of law reserved to the Legislature to declare law and policy. Relevantly, regarding acceptable overlap of powers, *Romero* also cited Justice Jackson's oft-cited concurrence in *Youngstown*:

> While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity.

*Romero*, 2021-NMSC-009, ¶ 34 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) (describing the balance of powers among the branches of the federal government)). In short, *Romero* should not be read to categorically foreclose executive action "in areas where legislative authority is undisputed." *Clark*, 1995-NMSC-048, ¶ 34.

{98} In part, *Romero* should also be read as recognizing the significance of the temporary nature of the executive actions, in contrast to the long-term policy-based objectives of the governors in *Taylor* and *Clark*. In addition, *Romero* should be read

62

as recognizing that the executive actions there were taken pursuant to the Legislature's enactment—the PHERA—rather than in the absence of statute or adverse to the known legislative will. *See Romero*, 2021-NMSC-009, ¶¶ 24-34.

{99} In the instant case, Petitioners present statutory examples enacted under the police power that overlap or share some intersection in the same area of law as provisions within the first Amended PHEO, but they neither show a clear conflict between the statute and the emergency measures nor otherwise demonstrate a violation of the legislative will. For example, Petitioners point to enacted laws regulating controlled substances and setting forth penalties relating to their abuse. *E.g.*, § 30-31-7(A)(2)(f) (defining fentanyl as a Schedule II drug); § 30-31-21 (stating the penalties for distributing Schedule II drugs to a minor). They then point to a purported distinction between Section 30-31-40(B) of the Controlled Substances Act and the relevant emergency measure regarding public-school wastewater testing: "Unlike the [first] Amended PHEO, however, [Section 30-31-40(B), (D)] prohibits any compelled testimony by persons engaged in either research or medical practice, and protects the identifying information of the subjects of the research." Petitioners also point to the Legislature's 2009 failure to enact a legislative proposal for drug testing of individual students, suggesting by citation of a Legislative Education Study Report that legislative will was weighed for student privacy

concerns. Beyond these suggestions of dissonance between the governmental branches, Petitioners merely conclude "that the Legislature intended to exercise its police power on this issue[,] as well."

{100} Under our above reading of *Romero*, it is not enough that Petitioners show that the emergency measures share some intersection with the Legislature's statutory schemes: they bear the burden to show either that the emergency orders have the effect of preventing the Legislature from accomplishing its constitutionally assigned function of making law or that the orders effectuate substantive policy changes beyond their posture as temporary emergency orders. Their argument fails on both counts, as the Legislature retains all of its power to make law in the areas affected by the temporary emergency orders, and Petitioners show no example of clear conflict between the emergency measures and existing statute.

{101} In concluding their encroachment argument, Petitioners cite *Youngstown* for the proposition that, like the Governor, the President of the United States could not invoke an emergency to cleanse an improper executive action. Where the President by executive order directed the Secretary of Commerce during wartime to take possession of most of the nation's steel mills and keep them operating, the United States Supreme Court determined that he acted improperly in a lawmaking capacity: "The President's order does not direct that a congressional policy be executed in a

manner prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President." *Youngstown*, 343 U.S. at 588. Petitioners assert that "[a]s in *Youngstown*, the Governor's orders act 'like a statute' to direct the execution of her own policy preferences—but the lawmaking authority to address societal 'crises' of the type at issue here remains with the Legislature."

{102}   However, Petitioners do not acknowledge the critical distinction between the instant case and *Youngstown*: in our case the Executive acted pursuant to a statute, the PHERA, whereas the President issued his executive order without any Congressional authorization. *See* 343 U.S. at 585-86 ("Indeed, we do not understand the Government to rely on statutory authorization for this seizure."). Accordingly, *Youngstown* does not advance Petitioners' argument.

**b.      Petitioners do not show that the emergency orders constitute "lawmaking" to infringe or usurp the Legislature's role and function**

{103}   Petitioners argue the emergency orders "overrid[e]" existing statutory schemes by executive lawmaking, thereby "usurp[ing] the Legislature's role and function." For support, Petitioners point to the purported examples above of the emergency measures infringing statutes, claiming that "the Governor's orders reflect a divergence in opinion [from the Legislature] about policy and priorities—sometimes stark and sometimes subtle." Petitioners assert "the circumstances here are . . . as the Court described in [*Taylor*]: an 'infringement . . . where the executive

65

does not execute existing New Mexico statutory or case law and rather attempts to create new law.'" (quoting 1998-NMSC-015, ¶ 24). Petitioners further assert that the emergency orders "implement long-term policy goals, not temporary emergency measures."

{104} At the core of Petitioners' argument is the meaning of *lawmaking*, the essence of legislative power. As we have already discussed, the Legislature's constitutional power and prerogative includes "the right to determine what the law shall be," "to create substantive law," and "to make public policy." *See Clark*, 1995-NMSC-048, ¶¶ 33-34; *Unite New Mexico*, 2019-NMSC-009, ¶ 8; *Taylor*, 1998-NMSC-015, ¶¶ 21, 24-25, 49. As also discussed, for a separation-of-powers challenge to an executive order pursuant to the PHERA, "[t]he operative question is whether the . . . [o]rder disrupts the proper balance between the executive and legislative branches and infringes on the legislative branch," *Romero*, 2021-NMSC-009, ¶ 34 (internal quotation marks and citation omitted), and "the proper inquiry [for such a disruption] focuses on the extent to which the action by one branch prevents another branch from accomplishing its constitutionally assigned functions," *Clark*, 1995-NMSC-048, ¶ 34 (brackets, internal quotation marks, and citation omitted).

{105} We draw further principles regarding the nature of lawmaking from *Taylor* and *Schwartz*. In *Taylor*, the executive respondents' substantive policy changes

"substantially *altered*, *modified*, *and extended* existing law." 1998-NMSC-015, ¶ 25 (emphasis added). In *Schwartz*, we recognized that "legislative responsibility" in the relevant area of law was "totally abandoned when *the power to reduce*, *nullify*, *or change* [] *priorities* [wa]s given over to the total discretion of another branch of government." 1995-NMSC-080, ¶ 16 (emphasis added) (internal quotation marks and citation omitted). These cases support the proposition that the power to create, change, and nullify the law is central to the Legislature's constitutional lawmaking power.

{106}     Under these principles, Petitioners do not show that the emergency orders constitute "lawmaking" nor usurp the Legislature's role and function. We discuss three primary reasons that Petitioners' arguments here do not avail.

{107}     First, Petitioners do not show that the emergency orders remove any degree of the Legislature's power to establish the law. Petitioners offer no example supporting that the emergency orders have affected the Legislature's power to alter, modify, extend, reduce, nullify, change, or otherwise flex its power over existing law. Importantly, the reach of this legislative power remains undiminished as regards both the substantive areas of law intersected by the emergency orders and the PHERA itself. In other words, the Legislature retains all lawmaking power over the areas of law encompassing gun violence and drug abuse, as well as over the statutes

under which the emergency orders were issued and on which those orders depend for continued existence. In this regard, the instant case differs importantly from both *Taylor*, wherein the Legislature would have had "to garner a veto-override majority of two-thirds" to modify the governor's unilateral public assistance regulations, and *Clark*, wherein the gaming compacts entered by the governor were "binding on the State of New Mexico for fifteen years" and threatened to "foreclose[] inconsistent legislative action or preclude[] the application of such legislation to the agreement." *Taylor*, 1998-NMSC-015, ¶ 47; *Clark*, 1995-NMSC-048, ¶¶ 34-35. In sum, Petitioners do not show that the emergency orders "prevent[] [the Legislature] from accomplishing its constitutionally assigned function[]" of lawmaking. *Clark*, 1995-NMSC-048, ¶ 34 (internal quotation marks and citation omitted).

{108}    Second, Petitioners do not show that the emergency orders conflict with existing statutory schemes to a level that "usurps the Legislature's role and function." Petitioners cite *Riddle* for the proposition that the Executive and the Judiciary cannot disregard detailed statutory schemes and their procedures without violating separation of powers. *See State ex rel. Riddle v. Toulouse Oliver*, 2021-NMSC-018, ¶¶ 38-40, 487 P.3d 815 (holding that, notwithstanding the COVID-19 pandemic, the Secretary of State "had a nondiscretionary duty to follow the primary election procedures set forth in the Election Code, and we cannot order relief that

68

deviates from those procedures"). However, *Riddle* considered whether the Secretary could deviate from a nondiscretionary statutory duty, whereas Petitioners do not show any examples in the emergency orders of deviation from statute that warrant further analysis under *Riddle*.

{109} We have already discussed Petitioners' assertions that the emergency provision regarding wastewater testing in public schools departs from relevant statutes or contradicts the legislative will. In sum, Petitioners provide no on-point analysis to support that privacy provisions in the Controlled Substances Act bar the testing of wastewater generally as required in the first Amended PHEO.

{110} As for suspension of JDAI, the two statutes cited by Petitioners do not support their claim that JDAI is "a program authorized by the *Legislature*" nor their suggestion that the program cannot be suspended by the *Executive*. Section 9-2A-14.1 establishes the Juvenile Continuum Grant Fund, which provides avenues of grant funding for CYFD to award "to juvenile justice continuums for the provision of cost-effective services and temporary, nonsecure alternatives to detention for juveniles arrested or referred to juvenile probation and parole or at a risk of such referral." Section 9-2A-14.1(B). While JDAI fits within this statutory description, Section 9-2A-14.1 does not mention JDAI by name nor require any specific program to exist as a grant candidate or recipient. Section 32A-2-2 enumerates the eleven

purposes of the Delinquency Act, the last eight of which constitute the JDAI core strategies from the Annie E. Casey Foundation added to the statute in 2007. *See* Section 32A-2-2 annot. Petitioners point to Subsection (H), which provides that the purpose of the Delinquency Act includes "to develop community-based alternatives to detention," but nothing in Section 32A-2-2 identifies or requires JDAI specifically. Because Petitioners do not show that the legislative will requires JDAI, suspension of that program does not demonstrate infringement or usurpation of the Legislature's role or function.

{111} As for DOC and DHS providing assistance to MDC, Petitioners argue that Section 10 of "[t]he [first] Amended PHEO effectively mandates an agreement between MDC and other agencies to address 'lack of staffing[ and] space' while sidestepping the requirements and checks that the Legislature sought to impose." However, the only requirements and checks Petitioners cite concern a district court order requirement for *inmate transfers* under Section 33-3-15, and an agency approval requirement for agreements with *other counties and municipalities*, Section 33-3-2. Petitioners offer no explanation as to how these requirements could pertain to DOC and DHS.

{112} As for restrictions on firearm possession in specified areas, Petitioners in fact highlight the *similarity* between the prohibited spaces defined in Section 1 of the

first Amended PHEO and in Section 30-7-2.1(B)(1)-(2). The first Amended PHEO regulates firearm possession "in public parks or playgrounds, or other public area[s] provided for children to play in," while the statute prohibits possession of a deadly weapon on "school premises," which include "the buildings and grounds, including playgrounds, playing fields and parking areas." By Petitioners' own characterizations, no meaningful divergence from statute is apparent by the relevant emergency measure, and Petitioners do not support this argument with further evidence of the emergency orders contradicting legislative schemes.

{113} Given that "the constitutional doctrine of separation of powers allows some overlap in the exercise of governmental function," Petitioners must show more than de minimis dissonance or conflict between the emergency orders and existing statutes to support their usurpation argument. *Clark*, 1995-NMSC-048, ¶ 32 (text only) (citation omitted). They have not carried this burden.

{114} Third, Petitioners assert but do not establish that the emergency orders "implement long-term policy goals, not temporary emergency measures." Petitioners point to EO 2023-135 which declares "a statewide public health emergency of unknown duration," and to the first Amended PHEO requiring "monthly inspections of licensed firearms dealers." However, they offer no analysis to explain how these discrete facts support a conclusion that the emergency orders

71

usurp the Legislature's policy-making role or are not temporary. As Respondents cite, in *Romero* we recognized in the context of the COVID-19 state of emergency that "the temporary emergency orders [there did not] constitute long-term policy decisions." 2021-NMSC-009, ¶ 34 (internal quotation marks omitted). *Romero* supports that the presumptively temporary nature of emergency measures cannot insulate them from a separation-of-powers challenge, but that temporary nature is relevant to such an analysis. Here, Petitioners present no basis for further inquiry against that presumption.

{115} Petitioners assert that "[t]he many policy considerations and ramifications attendant on" gun violence and drug abuse "are worth more than [Respondents'] two days' hasty drafting" of the first Amended PHEO, further suggesting the emergency orders diverge from the legislative will. However, given the limited evidence that the emergency orders diverge from existing statutes, as just discussed, we have no clear basis to know if the Legislature would deem the emergency orders as abiding with or departing from its policy positions. We do recognize, though, that the Legislature has thus far chosen not to modify the PHERA or enact legislative

72

oversight for declarations of public health emergencies under Section 12-10A-5—but could do so at any time.[20]

### 3. Petitioners do not show that nondelegation requirements are relevant to their challenge

{116} Petitioners' reply includes a section with the following header: "The Legislature could not delegate these powers to the Governor even if it wished to." Couched in nondelegation citations and hypotheticals, the text that follows offers no clear argument or analysis. Petitioners seem to suggest that the Legislature in the PHERA may have "vest[ed] unbridled or arbitrary power" in the Governor, but they do not advance a concrete, relevant position. *City of Santa Fe v. Gamble-Skogmo, Inc.*, 1964-NMSC-016, ¶ 19, 73 N.M. 410, 389 P.2d 13. Instead, Petitioners advise that this Court "must ask whether, if [the] PHERA is read as the Governor proposes,

---

[20]We concur with Respondents that "the Legislature has the authority [under Article IV, § 6] to resolve this issue by calling itself into an extraordinary session to repeal or modify that legislation." The same legislative power could obviously be exercised in a regular session. These feasible options to exercise legislative power to rescind or modify a legislative delegation of authority through an extraordinary or regular session stand in marked contrast to the argument we rejected in *Romero* as facially unworkable that "special sessions of the Legislature should be used in lieu of [the Executive's] emergency orders" to address a public health emergency. 2021-NMSC-009, ¶ 34. *See id.* ¶ 30 (recognizing the "long history in the United States" of legislative "delegation of substantial discretion and authority to the executive branch . . . to respond to health emergencies"). *See also* Section II(E)(1), paragraph 41, *supra* ("[T]he Legislature intended for the PHERA to be a broad statute under which the executive can declare and address crises of different form and scope as public health emergencies.").

73

the statute impermissibly gives the Governor 'the power to determine what the law will be,'" a lawmaking claim we have just addressed above. (quoting *Madrid v. St. Joseph Hosp.*, 1996-NMSC-064, ¶ 13, 122 N.M. 524, 928 P.2d 250).

{117} Importantly, while their citations are tethered to nondelegation or over-delegation requirements, Petitioners have not raised or articulated such a challenge to the PHERA. To the contrary, Petitioners' arguments in briefing and oral argument have been otherwise consistently trained on the emergency orders as the focus of this mandamus action, not on the Legislature's enactment of that statute. Accordingly, Petitioners' purpose in this portion of their reply is unclear.

{118} Our precedent makes clear the serious consideration we apply to issues concerning delegation of legislative power. *See State ex rel. State Park & Recreation Comm'n v. N.M. State Auth.*, 1966-NMSC-033, ¶ 9, 76 N.M. 1, 411 P.2d 984 ("The true distinction, therefore, is, between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made." (internal quotation marks and citation omitted)).[21] Nonetheless, framed in such

---

[21]*See also State ex rel. State Park & Recreation Comm'n*, 1966-NMSC-033, ¶ 10 ("Where a statute defines the general outlines for its operation, and therein provides that stated persons, officers, or tribunals shall, within designated

74

hypothetical terms and without clear argument, we will not guess at how Petitioners

view the relevance of their over-delegation position to their separation-of-powers

limitations, perform acts or ascertain facts upon which the statute by its own force will operate to accomplish the lawmaking intent, the action by the persons, officers, or tribunals within the stated limitations may be administrative and not exclusively legislative, executive, or judicial in its nature and essence[, in which case] the statute does not delegate legislative power or confer executive or judicial power and authority." (internal quotation marks and citation omitted)); *Schwartz*, 1995-NMSC-080, ¶ 16 ("The legislative responsibility to set fiscal priorities through appropriations is totally abandoned when the power to reduce, nullify, or change those priorities is given over to the total discretion of another branch of government." (internal quotation marks and citation omitted)); *Gamble-Skogmo*, 1964-NMSC-016, ¶ 19 ("Standards required to support a delegation of power by the local legislative body need not be specific. Most decisions hold that broad general standards are permissible so long as they are capable of a reasonable application and are sufficient to limit and define the Board's discretionary powers." (internal quotation marks and citations omitted)); *Cobb*, 2006-NMSC-034, ¶ 41 ("[T]he [L]egislature may delegate any technically nonlegislative power which it may itself lawfully exercise[, but] may not vest unbridled or arbitrary authority in an administrative body, however, and must provide reasonable standards to guide it. . . . The essential inquiry is whether the specified guidance sufficiently marks the field within which the administrator is to act so that it may be known whether [the administrator] has kept within it in compliance with the legislative will." (internal quotation marks and citations omitted)); *Unite New Mexico*, 2019-NMSC-009, ¶ 8 (stating in the administrative law context, "what the Legislature cannot do is delegate the right to determine, in the first instance and wholesale, what that [legislative] scheme, policy, or purpose will be. Only if we could say that there is an absence of standards for the guidance of the Administrator's action, so that it would be impossible in a proper proceeding to ascertain whether the will of [a legislature] has been obeyed, would we be justified in overriding its choice of means for effecting its declared purpose." (internal quotation marks and citation omitted)); *Madrid*, 1996-NMSC-064, ¶ 13 ("If the regulations or actions of an official or board authorized by statute do not in effect determine what the law shall be . . . such regulation or action is administrative, and not legislative, in its nature and effect." (omission in original) (internal quotation marks and citation omitted)).

75

claim. *Dominguez v. State*, 2015-NMSC-014, ¶ 15, 348 P.3d 183 ("New Mexico courts will not review unclear arguments, or guess at what litigants' arguments might be." (text only) (citation omitted)).

{119} Given the foregoing, we hold that Petitioners have not shown under any of their separation-of-powers arguments that the emergency orders "disrupt[] the proper balance between the executive and legislative branches," *Romero*, 2021-NMSC-009, ¶ 34, or constitute either an improper "accumulation of too much power in one governmental entity" or an action by the Governor "prevent[ing the Legislature] from accomplishing its constitutionally assigned function[]" of determining what the law shall be, *Clark*, 1995-NMSC-048, ¶¶ 31, 34. Accordingly, Petitioners have not met their burden to show a violation of Article III, Section 1 of the New Mexico Constitution.

{120} Beyond the parties' arguments, Justice Zamora's dissent asserts a separation-of-powers issue arises from our interpretation of the PHERA's definition of a public health emergency. The dissent approves our rejection of Petitioners' executive lawmaking claims but then asserts under *Cobb* that "it is equally violative of the separation of powers principle when the Legislature delegates too much discretionary authority to the executive." *Dissent* ¶ 163 (citing *Cobb*, 2006-NMSC-034, ¶ 41). Respectfully, this argument overlooks that *Cobb* expressly recognized

76

the nondelegation doctrine "does not completely prevent[] the Legislature from vesting a large measure of discretionary authority in administrative officers and bodies." 2006-NMSC-034, ¶ 41 ("There are many powers so far legislative that they may properly be exercised by the [L]egislature, but which may nevertheless be delegated, since the [L]egislature may delegate any technically nonlegislative power which it may itself lawfully exercise." (internal quotation marks and citation omitted)). As established above, the Legislature by way of the PHERA has delegated nonlegislative power to the Executive.

{121} Importantly, *Cobb* had no occasion to consider, as we recognized in *Romero*, the "long history" of "delegation[s] of substantial discretion and authority to the executive branch . . . to respond to health emergencies" and courts' "liberal[] constru[ction] [of such] grants of authority." *Romero*, 2021-NMSC-009, ¶ 30 (citing *Reeb*, 2021-NMSC-006, ¶ 27). To the contrary, the *Cobb* line of overdelegation cases discussing "reasonable standards to guide" executive discretion focused on delegations of fiscal discretion in nonemergency situations. *See Cobb*, 2006-NMSC-034, ¶¶ 1, 15, 41 (determining the 2001 version of Section 1-14-15(B) granted the State Canvassing Board "unfettered discretion" in charging applicants for recount and recheck procedures); *Schwartz*, 1995-NMSC-080, ¶ 21 (determining Section 6-3-6 did "not alone supply standards sufficient to authorize executive department

77

regulation of the state fisc"); *State ex rel. Holmes v. State Bd. of Fin.*, 1961-NMSC-172, ¶ 30, 69 N.M. 430, 367 P.2d 925 (determining 24, Chap. 254, N.M. S.L.1961 is unconstitutional in granting the state board of finance authority to reduce all annual operating budgets). Highlighting the distinction between executive authority and discretion in emergency and non-emergency scenarios, the *Holmes* Court distinguished the need for "detailed standards to guide an administrative officer" in that case from "situations where it is difficult or impracticable to lay down a definite, comprehensive rule, or the discretion relates to the administration of a police [power] regulation and is necessary to protect the public morals, health, safety, and general welfare." 1961-NMSC-172, ¶ 36 (internal quotation marks omitted); *compare Romero*, 2021-NMSC-009, ¶ 30 ("[W]hen the discretion to be exercised by an executive officer or board relates to a police regulation for the protection of the public morals, health, safety, or general welfare, and it is impossible or impracticable to provide strict standards, and to do so would defeat the legislative object sought to be accomplished, legislation conferring such discretion may be valid and constitutional without such restrictions and limitations." (text only) (citation omitted)).

{122} Ignoring these distinctions, Justice Zamora's dissent asserts our "interpretation of the PHERA . . . is devoid of any standards or guidance

78

constraining a governor's discretion to determine when and under what circumstances a public health emergency may be declared or how long it may last." *Dissent* ¶ 166. We disagree. As discussed, the relevant constraints on a governor's discretion include:

- Section 12-10A-3(G)'s requirement of "an extremely dangerous condition or a highly infectious or toxic agent, including a threatening communicable disease, that poses an imminent threat of substantial harm";

- Section 12-10A-5's requirement for a declaration to specify "the nature of the public health emergency" and "the conditions that caused the public health emergency";

- our requirement under caselaw for a reasonable relationship of means and ends for police power measures intended to protect the public health;

- the Legislature's undiminished lawmaking power over delegated authority, including to alter the PHERA; and

- judicial challenges pursuant to these constraints.

We are confident these guardrails properly delimit the Legislature's delegation of authority to the Governor for declaring and addressing a public health emergency.

## III.  CONCLUSION

{123}  Though moot, we hold this case presents issues of substantial public interest and which are capable of repetition yet evade review. We grant the petition as to the emergency orders' suspension of the JDAI program, an action that exceeds the limits

of the police power. Otherwise, we deny the petition as to all other issues raised and hold Petitioners do not meet their burden to show the emergency orders violate either the challenged scope of the PHERA or the separation-of-powers doctrine.

{124}  **IT IS SO ORDERED.**

_____

**C. SHANNON BACON, Justice**

**WE CONCUR:**

_____

**DAVID K. THOMSON, Chief Justice**

_____

**JULIE J. VARGAS, Justice**

**MICHAEL E. VIGIL, Justice, dissenting, concurring in dissent**

**BRIANA H. ZAMORA, Justice, dissenting, concurring in dissent**

**VIGIL, Justice (dissenting).**

{125} I agree that the case is not moot. However, I am unable to join the majority opinion because it takes the word "emergency" out of the definition of "public health emergency" in the Public Health Emergency Response Act (the PHERA), NMSA 1978, §§ 12-10A-1 to -19 (2003, as amended through 2015). Through the language of the PHERA, the Legislature has expressed its intent that the definition of a "public health emergency" be construed in the context of an "emergency." The PHERA is but one component of the Emergency Powers Code, which also includes the All Hazards Emergency Management Act, NMSA 1978, §§12-10-1 to -10 (1959, as amended through 2007); the Disaster Succession Act, NMSA 1978, §§12-11-1 to -10 (1959); and the Energy Emergency Powers Act, NMSA 1978, §§12-12-1 to -9 (1980). *See* NMSA 1978, § 12-9B-1 (2005). The definition of an "emergency" is "an unforeseen combination of circumstances or the resulting state that calls for immediate action." *Emergency*, *Webster's Third New Int'l Dictionary of the English Language, Unabridged* (2002). This common meaning and understanding of what constitutes an emergency is contained within the PHERA's definition of a "public health emergency" set forth in Section 12-10A-3(G).

{126} In pertinent part, as related to this case, a "public health emergency" is "the occurrence or imminent threat of exposure to an extremely dangerous condition . . .

81

that poses an imminent threat of substantial harm to the population of New Mexico or any portion thereof." Section 12-10A-3(G). I agree with the standard of review set forth by the majority for construing statutes. *Maj. op.* ¶¶ 28-30. Applying those rules, I come to the following conclusions. Consistent with the common meaning of an emergency, an "occurrence" is "something that takes place; *esp*: something that happens unexpectedly and without design[,]" such as "a disastrous occurrence." *Occurrence*, *Webster's Third New Int'l Dictionary of the English Language, Unabridged* (2002). But that is not all. To qualify as a "public health emergency", the PHERA requires that the "occurrence" consist of an "extremely dangerous condition" or the "imminent threat" of an "extremely dangerous condition." Section 12-10A-3(G). A condition is "dangerous" when it is "able or likely to inflict injury," and it is "extremely" dangerous if the danger is of "a condition of extreme urgency or necessity." *Dangerous*, *Webster's Third New Int'l Dictionary of the English Language, Unabridged* (2002). The "imminent threat" of a "dangerous condition" requires that it be "menacingly near." *Imminent*, *id.* Finally, the PHERA requires that the extremely dangerous condition or its imminent threat "poses an imminent threat of substantial harm to the population of New Mexico or any portion thereof," § 12-10A-3, which is to say that the "threat of substantial harm" must be "menacingly near."

{127} The Legislature has therefore made it clear that there must be a true "emergency" for a "public health emergency" to exist. The majority comes to a different conclusion, based on what I believe to be a flawed reading of Section 12-10A-3(G). I explain.

{128} Returning to the definition of "public health emergency," it "means the occurrence or imminent threat of exposure to an extremely dangerous condition or a highly infectious or toxic agent." Section 12-10A-3(G). The majority opinion separates the word "occurrence" from the rest of the statutory language, leading to its conclusion that an "occurrence" is a stand-alone circumstance which "may be either *happening currently* or *happening soon*." *Maj. op.* ¶ 35. This is fatal because it takes away from what the Legislature clearly meant an "emergency" to be. The phrase "an extremely dangerous condition" in context must be interpreted to modify "occurrence"—that is, there must be "the occurrence . . . of . . . an extremely dangerous condition" for an emergency to exist. Section 12-10A-3(G). The majority says it recognizes that the word "imminent" appears twice in the definition, *maj. op.* ¶ 35, but it effectively ignores where it first appears, leaving the meaning of a "public health emergency" to nothing more than an "event." *Maj. op.* ¶ 35. Moreover, even if drug abuse is included in the term "toxic agent" the threat of exposure must be "imminent" and not merely an "occurrence."

83

{129} The majority further concludes, in its discussion of "imminent" that the Legislature did not impose any "obvious restriction on a governor's discretion to determine that a threat is *happening soon* or *menacingly near*." *Maj. op.* ¶ 36. This result is untenable and clearly beyond what the Legislature intended. The majority's statement and its conclusion that a public health emergency may consist of an occurrence leaves it totally in the discretion of any governor to assume sweeping emergency powers for any reason the governor chooses. I cannot agree that the Legislature intended this result, and the language it uses belies any such intent.

{130} To summarize, a "public health emergency" consists of an unexpected or immediately impending extremely dangerous condition that inflicts, or is likely to inflict, substantial injury or harm to such an extreme manner or to such an extreme extent that immediate action is required to protect the population of New Mexico or any portion thereof. Simply stated, there must be an emergency in order for a "public health emergency" to exist. I now turn to the statutory requirements for the Governor to declare a public health emergency.

{131} The declaration of a public emergency serves two purposes. First, it requires the Governor to specify the facts relied upon for declaring the existence of a public health emergency. The statute requires more than the Governor being able to say, "There is a public health emergency because I said so." Second, it limits what

emergency police powers are appropriate to manage the public health emergency— that is to say, there must be a link between the emergency that actually exists and a necessity to use the police powers that are invoked to combat that emergency. I briefly address each in turn.

{132} The PHERA requires that the executive order must specify, among other matters: "(1) the nature of the public health emergency; (2) the political subdivisions or geographic areas affected by the public health emergency; [and] (3) the conditions that caused the public health emergency." Section 12-10A-5(B)(1)-(3). If the facts relied on by the Governor do not satisfy the statutory requirements of a "public health emergency," the declaration is invalid. With all due respect, the executive orders at issue fail to set forth facts describing an unexpected or immediately impending extremely dangerous condition that inflicts, or is likely to inflict, substantial injury or harm to such an extreme manner or to such an extreme extent that immediate action is required to protect the population of New Mexico or any portion thereof.

{133} The original executive order declaring a public health emergency based on gun violence, State of N.M., Exec. Ord. 2023-130 (EO 130), was issued on September 7, 2023, and the original executive order based on drug abuse, State of N.M., Exec. Ord. 2023-132 (EO 132), was issued the following day, September 8,

85

2023. *Maj. op.* ¶ 4. The majority accurately captures the asserted bases for declaring a public health emergency. *Maj. op.* ¶¶ 5-6. Again, with all due respect, the declarations fail to demonstrate that emergency powers must be employed to combat and eradicate gun violence and drug abuse. At best, they merely describe a condition that is happening and totally fail to describe an "emergency" as it is commonly understood, or as required by the Legislature in its definition of a "public health emergency."

{134} Turning to the police powers that are invoked in the Public Health Emergency Orders (PHEOs), the majority again correctly describes their content and evolution. *Maj. op.* ¶¶ 7, 10-13. Once again, I respectfully submit that banning guns from public parks or playgrounds in the City of Albuquerque and Bernalillo County, testing wastewater for illicit substances at all public schools, and immediately suspending the Juvenile Detention Alternative Initiative (JDAI) are not emergency actions that must be immediately taken against gun violence or drug abuse to protect New Mexicans. In fact, the logic used by the majority opinion to uphold the banning of guns in public parks or playgrounds in the City of Albuquerque and Bernalillo County and the testing of wastewater for illicit substances at all public schools as valid exercises of police power could likewise be employed to justify the immediate suspension of JDAI. Conversely, the majority's reasoning used to exclude the

immediate suspension of JDAI as a proper exercise of police power also applies to exclude banning guns from public parks or playgrounds in Albuquerque and Bernalillo County, as well as the testing of wastewater for illicit substances in public schools as necessary to eradicate a public health emergency.

{135} Finally, as the majority points out, the executive orders were initially issued on September 7 and 8, 2023, and subsequently regularly renewed through October 13, 2024. Are we to now conclude that there is no longer a public health emergency caused by either gun violence or drug abuse? There is nothing in the record showing that anything between September 7 and 8, 2023, and October 13, 2024 has materially changed.

{136} Extraordinary powers are given to the Governor to be exercised in extraordinary circumstances. *See Grisham v. Reeb*, 2021-NMSC-006, ¶¶ 13-21, 480 P.3d 852. The majority opinion sets the bar far below what the Legislature requires for the exercise of those extraordinary powers, and therefore, I must dissent.

---

**MICHAEL E. VIGIL, Justice**

**I CONCUR:**

---

**BRIANA H. ZAMORA, Justice**

**ZAMORA, Justice (dissenting)**

{137} "[A]n emergency power of necessity must at least be limited by the emergency." *Hamdi v. Rumsfeld*, 542 U.S. 507, 552 (2004) (Souter, J., concurring in part, dissenting in part, and concurring in the judgment). According to the majority's interpretation of the Public Health Emergency Response Act (PHERA), there is no such limitation, and the Governor's Executive Orders (EOs) are therefore valid exercises of executive authority under the PHERA. In my view, the PHERA authorizes executive action only to address public health problems that constitute emergencies. While substance abuse and gun violence are terrible and tragic public health issues, the EOs fail to establish that they are emergencies under the PHERA. I would hold that the EOs and the Amended Public Health Emergency Order (PHEO) predicated upon the EOs were invalid exercises of the Governor's authority under the PHERA and were without legal effect.

**IV. THE PHERA'S PLAIN LANGUAGE LIMITS THE GOVERNOR'S AUTHORITY BY REQUIRING THAT A PUBLIC HEALTH EMERGENCY BE DECLARED ONLY TO ADDRESS A SUDDEN OR UNFORESEEN OCCURRENCE THAT REQUIRES IMMEDIATE ACTION TO PREVENT SUBSTANTIAL HARM**

{138} I disagree with the majority because its interpretation of the PHERA fails to impose any limitation on the Governor's power to declare, act upon, and determine the end of a public health emergency. The majority's reading of the PHERA is not

88

commanded by its plain language, nor is it consistent with the Legislature's intent in enacting the PHERA as part of the Emergency Powers Code, *see* NMSA 1978, § 12-9B-1 (2005). I believe the plain language of the PHERA unambiguously provides that a public health emergency arises only when a sudden or unforeseen public health occurrence or threat emerges that requires immediate action to prevent substantial harm.

{139} "In construing the language of a statute, our goal and guiding principle is to give effect to the intent of the Legislature." *Grisham v. Reeb*, 2021-NMSC-006, ¶ 12, 480 P.3d 852. In determining intent, we look to the language used by the Legislature and "generally give the statutory language its ordinary and plain meaning unless the Legislature indicates a different interpretation is necessary." *Id.* (internal quotation marks and citation omitted). However, we do not construe statutory provisions in a vacuum but instead read them in the context of the entire statute. *Chavez v. Bridgestone Americas Tire Operations*, *LLC*, 2022-NMSC-006, ¶ 40, 503 P.3d 332.

{140} The PHERA defines a *public health emergency* as "the *occurrence or imminent threat of* exposure to an extremely dangerous condition or a highly infectious or toxic agent, including a threatening communicable disease, that poses an *imminent threat of substantial harm* to the population of New Mexico or any

portion thereof." Section 12-10A-3(G) (emphasis added). We frequently turn to dictionary definitions to ascertain the plain meaning of statutory language. *State v. Boyse*, 2013-NMSC-024, ¶ 9, 303 P.3d 830. While dictionary definitions are helpful—and sometimes necessary—in identifying the meaning of individual words in a statute, we do not read statutory language formalistically or mechanically. *State v. Davis*, 2003-NMSC-022, ¶ 6, 134 N.M. 172, 74 P.3d 1064. "Enactments of the legislature are to be interpreted to accord with common sense and reason." *Lopez v. Emp. Sec. Div.*, 1990-NMSC-102, ¶ 9, 111 N.M. 104, 802 P.2d 9.

{141} I believe the majority failed to read the words comprising the definition of *public health emergency* in the PHERA as they appear in relation to one another and in light of the statute's title and therefore misses the common-sense meaning of the definition as a whole. The majority reasons that, as long as the public health problem used to justify the emergency declaration *was happening* at the time of the declaration, the statutory requirement has been met. *Maj. op.* ¶ 36 ("We need not construe 'imminent threat of exposure to' further in this context, as the parties do not contest that gun violence and drug abuse were happening at the time of their declaration as public health emergencies."). In my view, this interpretation fails to accord with a common-sense reading of the phrase *occurrence or imminent threat*,

which indicates a problem that is emergent (coming into existence) or is about to emerge (imminent)—that is, a problem that is time-specific.

{142} Moreover, the majority has largely ignored the second half of the definition of *public health emergency* in Section 12-10A-3(G). *See maj. op.* ¶¶ 35-36. The occurrence or imminent threat of relevance in defining a public health emergency must be one "*that poses an imminent threat of substantial harm* to the population of New Mexico or any portion thereof." Section 12-10A-3(G) (emphasis added). This Court must construe a statute so that no part of it is rendered superfluous. *State v. Javier M.*, 2001-NMSC-030, ¶ 32, 131 N.M. 1, 33 P.3d 1. We must presume that the Legislature "say[s] what it means and mean[s] what it says." *State v. Rael*, 2024-NMSC-010, ¶ 41, 548 P.3d 66. *Merriam-Webster's Collegiate Dictionary* provides that *imminent* means "ready to take place" and suggests that something is "hanging threateningly over one's head." *Imminent*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2005). Similarly, *Black's Law Dictionary* defines *imminent* as "(Of a danger or calamity) threatening to occur *immediately*; dangerously impending," citing "imminent peril" as an example, and alternatively defining *immediate* as "[a]bout to take place." *Imminent*, *Black's Law Dictionary* (12th ed. 2024) (emphasis added). Thus, an occurrence or threat must not only be emergent,

it must also pose an *immediate* threat of substantial harm to the people of New Mexico.

{143} Finally, the majority's reading minimizes the importance of the word *emergency* in the title of the PHERA. A statute's "title is quite properly to be considered a part of an act, particularly where it is a constitutional requirement that every act have a title, as is true in this state." *State v. Gutierrez*, 2023-NMSC-002, ¶ 42, 523 P.3d 560 (internal quotation marks and citation omitted). *Emergency* is defined as a "sudden and serious event or an unforeseen change in circumstances that calls for immediate action to avert, control, or remedy harm" or an "urgent need for relief or help; an exigent circumstance in which immediate assistance is needed to protect property, public health, or safety, or to lessen or avert the threat of disaster." *Emergency*, *Black's Law Dictionary* (12th ed. 2024). Accordingly, the use of the word *emergency* in the statute's title further constrains the PHERA, requiring that it be used to address only "sudden," "serious," "unforeseen," "urgent" or "exigent" occurrences or threats that "call[] for immediate action" or "immediate assistance." *See id.*

{144} Read as a whole, I believe a common-sense interpretation of the PHERA unambiguously establishes that a public health emergency exists only when there emerges a sudden or unforeseen occurrence exposing New Mexicans to, or

threatening to immediately expose them to, a dangerous condition or toxic agent, thereby requiring immediate action to prevent substantial harm.

## V. EVEN IF THE LANGUAGE OF THE PHERA IS AMBIGUOUS, THE LEGISLATURE HAS EXPRESSED ITS INTENTION THAT THE PHERA APPLY ONLY IN TRUE EMERGENCIES

{145}   However, even if the language of the statute is ambiguous, the Legislature's placement of the PHERA within the Emergency Powers Code evinces its intention that the PHERA apply only in extraordinary circumstances. "Legislative intent is this Court's touchstone when interpreting a statute." *State v. Vest*, 2021-NMSC-020, ¶ 21, 488 P.3d 626 (text only) (citation omitted). If the language of a statute is ambiguous, we interpret it in light of "its obvious spirit or reason." *Id.* (internal quotation marks and citation omitted). In doing so, we read individual provisions "in conjunction with statutes addressing the same subject matter, ensuring a harmonious, common-sense reading." *Chatterjee v. King*, 2012-NMSC-019, ¶ 12, 280 P.3d 283; *see also United Rentals Nw., Inc. v. Yearout Mech., Inc.*, 2010-NMSC-030, ¶ 22, 148 N.M. 426, 237 P.3d 728 ("[W]e can look to other statutes in pari materia in order to determine legislative intent." (internal quotation marks and citation omitted)).

{146}   The PHERA is part of a "concurrent and complimentary" legislative scheme "compiled within a suite of statutes known as the Emergency Powers Code." *Reeb*, 2021-NMSC-006, ¶ 15; *see* § 12-9B-1 ("Chapter 12, Articles 10, 10A, 11 and 12

93

NMSA 1978 may be cited as the 'Emergency Powers Code.'"). In addition to the PHERA, NMSA 1978, §§ 12-10A-1 to -19 (2003, as amended through 2015), the Emergency Powers Code includes the All Hazard Emergency Management Act (AHEMA), NMSA 1978, §§ 12-10-1 to -10 (1959, as amended through 2007), and the Disaster Acts, *see* NMSA 1978 §§ 12-11-1 to -25 (1955, as amended through 2005), among others. By including the PHERA within the Emergency Powers Code, the Legislature expressed its intention that the definition of a *public health emergency* be construed in the context of an "emergency."

{147} The majority largely dismisses the significance of the PHERA's placement within the Emergency Powers Code, reasoning, in part, that "within the PHERA the Legislature has provided a more specific term and definition of *public health emergency*, which counsels for that term's prevailing importance." *Maj. op.* ¶ 53. The majority cites *State v. Santillanes*, 2001-NMSC-018, ¶ 7, 130 N.M. 464, 27 P.3d 456, to support its reasoning, quoting that court's statement that "if two statutes dealing with the same subject conflict, the more specific statute will prevail over the more general statute absent a clear expression of legislative intent to the contrary." *Maj. op.* ¶ 53. But the majority has pointed to no conflict between the language in the PHERA and the common-sense understanding of the word *emergency*. To the contrary, in my view, the majority has improperly construed the PHERA as devoid

94

of any requirement that the need for action in a public health emergency be urgent, as would be expected in an emergency.

{148}   The interconnectedness of the Emergency Power Code's provisions is evident from the facts of this case. "The New Mexico Constitution vests the power to appropriate money *exclusively* with the Legislature." *State ex rel. Candelaria v. Grisham*, 2023-NMSC-031, ¶ 34, 539 P.3d 690 (internal quotation marks and citation omitted). Because the Legislature did not include a funding mechanism in the PHERA, a governor declaring a public health emergency under the PHERA must rely on the emergency funding provisions found elsewhere in the Emergency Powers Code. Here, the EOs and the PHEO invoked emergency powers arising under the AHEMA and Sections 12-11-23 to -25 to fund the Governor's measures. *See* EO 2023-130, at 2; EO 2023-132, at 2-3. It is beyond question that these emergency funding provisions may only be invoked under extraordinary circumstances. Section 12-11-25 states that an appropriation under Sections 12-11-23 and 12-11-24[22] of up to $750,000 "shall be expended for disaster relief for any disaster declared by the governor *to be of such magnitude as to be beyond local control* and requiring the

---

[22]Section 12-11-25 references "money appropriated by Sections 6-7-1 and 6-7-2 NMSA 1978." In 2005, Sections 6-7-1 and 6-7-2 were recompiled as Sections 12-11-23 and 12-11-24, respectively. *See* 2005 N.M. Laws, ch. 22, § 4.

resources of the state" and authorizes "state agenc[ies] to provide those resources and services *necessary* to avoid or minimize economic or physical harm *until a situation becomes stabilized and again under local self-support and control.*" (Emphasis added.) The AHEMA repeats this language. In the case of a natural or man-made disaster, Section 12-10-4(B)(3) authorizes the Governor to "provide those resources and services *necessary* to avoid or minimize economic or physical harm *until a situation becomes stabilized and again under local self-support and control.*" (Emphasis added.)

{149} These express limitations, which ensure that the Governor may not expend the designated funds unless a genuine emergency exists, offer further support for my view that the PHERA may only be invoked under extraordinary circumstances. Indeed, by relying on Section 12-11-25, the EOs and PHEO authorize the funding of the Governor's gun violence and drug abuse measures only to the extent that the gun violence and drug abuse problems identified in the orders constitute conditions causing widespread, destabilizing harm that require an immediate response to bring them back under local control. To read the PHERA as lacking any requirement that a public health emergency arise only upon the emergence of a sudden or unforeseen occurrence or threat requiring immediate action to prevent substantial harm would

be to ignore the Legislature's decision to include the PHERA with other provisions of the Emergency Powers Code.

{150}    In ascertaining the Legislature's intent in enacting the PHERA, we must also consider provisions other than the definitional one. "All of the provisions of a statute, together with other statutes in pari materia, must be read together to ascertain legislative intent." *State v. Davis*, 2003-NMSC-022, ¶ 12, 134 N.M. 172, 74 P.3d 1064. Importantly, the PHERA includes an express immunity provision applicable to "the state, its political subdivisions, the governor, the secretary of health, the secretary of public safety . . . [and] any other state or local officials or personnel who assist during [a] public health emergency." Section 12-10A-14. It limits their liability for death, personal injury, or property damage for "*complying with the provisions of the Public Health Emergency Response Act or any rule adopted pursuant to th[e PHERA]*." *Id.* (emphasis added). If the onset of a public health emergency need not be sudden or unforeseen, it is hard to fathom why the Legislature would have felt compelled to enact a special immunity provision. Sudden or unforeseen problems may present unanticipated challenges to governance and require flexible and rapid responses by state officials that may expose them to greater liability. Long-standing, chronic, and anticipated public health problems

97

present no such concerns since officials would be adequately protected under existing governmental immunity law.

{151} The Legislature titled the PHERA the "Public Health Emergency Response Act," included the words "occurrence" and "imminent" in its definition of a *public health emergency*, placed the PHERA within the Emergency Powers Code, and included an immunity clause specifically shielding government officials from liability for carrying out actions pursuant to the PHERA. Each of these actions indicates that the Legislature intended to limit the powers it has delegated to the executive branch under the PHERA to genuine emergencies. I would interpret the PHERA as establishing that a public health emergency exists only when there emerges a sudden or unforeseen occurrence or threat exposing New Mexicans to, or threatening to immediately expose them to, a dangerous condition or toxic agent which requires immediate action to prevent substantial harm.

{152} Our previous opinions interpreting the PHERA, especially *Reeb* and *Romero*, were not called upon to seriously contend with the scope of the statutory scheme because the public health threat giving rise to the Governor's emergency orders in those cases (COVID-19) was so sudden and of such immediate danger to the people of New Mexico that the existence of a public health emergency was not reasonably subject to dispute. *See Reeb*, 2021-NMSC-006, ¶ 23; *Grisham v. Romero*, 2021-

98

NMSC-009, ¶ 7, 483 P.3d 545. Here, the public health threats posed by gun violence and drug abuse, while extremely serious, are notably different from the public health threat addressed in *Reeb* and *Romero*.

{153} The gun violence and drug abuse problems identified as the rationales for the Governor's EOs existed well before 2023. These are chronic public health problems in New Mexico demanding long-term policy solutions. A 2019 analysis of epidemiological data conducted by the New Mexico Department of Health noted that "[t]rends over the past two decades reveal persistent annual increases in the rates and numbers of firearm deaths in New Mexico." Mathew Christensen & Michael Landen, *Firearm Injury Deaths in New Mexico*, N.M. Epidemiology (N.M. Dep't of Health), Jan. 18. 2019, at 1, 1. And as early as 2004, the state's epidemiologists identified increasing drug overdose and non-fatal drug-related hospitalization rates over the preceding decade. *See* Off. of Epidemiology, N.M. Dep't of Health, Drug Abuse Patterns and Trends in New Mexico 10-11, 22 (Jan. 2005), https://www.nmhealth.org/data/view/substance/262/ (last visited Jan. 28, 2025). A 2016 report told a similar dispiriting story. *See* Substance Abuse Epidemiology Section, N.M. Dep't of Health, New Mexico Substance Abuse Epidemiology Profile 31 (Jan. 2016), https://www.nmhealth.org/data/view/substance/1862/ (last visited

Jan. 28, 2025) (showing that drug overdose death rates increased between 2001 and 2014).

{154}   The EOs and PHEO cite increasing gun violence and drug abuse in the state but fail to establish any alarming departure from longer-term trends or the emergence of sudden or unforeseen threats. EO 2023-130, which declares a gun violence emergency, begins with the recitation that "New Mexico *consistently* has some of the highest rates of gun violence in the nation." (Emphasis added.) A problem that has "consistently" been in existence can hardly be said to be either sudden or unforeseen or to have just emerged so as to justify an *emergency* response.

{155}   Nor does EO 2023-130 declare that the problem of gun violence in the state has emerged in some sudden or unforeseen form. The order recites an increase in "the rate of gun deaths" of 43% from 2009 to 2018 in New Mexico; the fact that "guns are the leading cause of death among children and teens"; that "New Mexico has recently experienced an increasing amount of mass shootings, including mass shootings in Farmington and Red River this year"; and that "the increasing number of gunshot victims strains our already over-burdened healthcare system and places undue pressure on medical professionals and resources." EO 2023-130, at 1. None of these findings describe sudden or unforeseen threats emerging from gun violence. The first finding describes data ending in 2018 and describes a trend occurring more

than five years prior to the issuance of the order. In using non-specific language such as "increasing" and "recently" (in the latter two recitations) and providing no temporal or other context to the assertion that guns are the leading cause of death among children and teens in New Mexico, EO 2023-130 fails to indicate how these tragic facts indicate the emergence of the kind of sudden or unforeseen threats contemplated by the PHERA.[23]

{156} Similarly, EO 2023-132, declaring drug abuse to be a public health emergency, describes a "growing and alarming trend" (of unspecified magnitude or duration) and "a significant increase in drug-related deaths, with 1,501 fatal overdoses reported in the state in 2021," a data point two years prior to the issuance of the order. EO 2023-132, at 1. Notably, fatal overdoses declined in 2022 and 2023.

---

[23]Empirical data also suggest the trends and facts identified in EO 2023-130 are neither suddenly emergent nor unforeseen. Like the order's recitation that the rate of gun deaths has increased, its assertion that "guns are the leading cause of death among children and teens," EO 2023-130, at 1, is consistent with long-term trends in New Mexico. *See State Data: New Mexico*, Johns Hopkins Bloomberg Sch. of Pub. Health, https://publichealth.jhu.edu/center-for-gun-violence-solutions/new-mexico (last visited Jan. 28, 2025) (noting that "[f]irearms were the leading cause of death among children and teens ages 1-17 from 2018 to 2022"). Additionally, the number of emergency room visits due to firearm injuries declined slightly between 2022 and 2023. *See Gun Violence in New Mexico*, Firearm Injury Emergency Department (ED) Visits (all ages) in New Mexico by Year, 2019-2023, https://www.governor.state.nm.us/gun-violence-dashboard/#GV-Metric0 (last visited Jan. 28, 2025) (showing that firearm injury emergency department visits decreased from 1510 in 2022 to 1484 in 2023).

*Overdose Deaths Declined in New Mexico Again*, N.M. Dep't of Health: News (Jan. 7, 2025), https://www.nmhealth.org/news/awareness/2025/1/?view=2169 (last visited Jan. 28, 2025).

{157} The recitations in the EOs also fail to describe a basis for finding that *immediate* action is required. The measures undertaken pursuant to the PHEO demonstrate this. Most of the measures imposed pursuant to the Secretary of Health's Amended PHEO consist of long-term policies—monthly inspections of firearms dealers, wastewater testing for illicit substances, resources for law enforcement, agency coordination to assist in the apprehension of people with outstanding warrants, planning to improve behavioral health networks, and assistance to "ensure adequate staffing, space, and screening for arrested and incarcerated individuals." *See* PHEO at 2-3. Only one of the PHEO's measures sounds in immediacy: the direction that "New Mexico Managed Care Organizations shall immediately ensure that individuals who need drug or alcohol treatment have received a permanent, adequate treatment placement within 24 hours of the request." *Id.* at 2. However, because the measure is not tied to a sudden or unforeseen threat, its inclusion alone fails to satisfy the requirements of the PHERA. Moreover, it is not clear that any of the measures undertaken pursuant to the PHEO could not have

been undertaken without an emergency order pursuant to the Governor's existing authority to enforce statutory law.

{158} Finally, the duration and repeated renewal of the EOs belies the claim that they were emergency measures rather than long-term policy efforts. In her response to the petition, the Governor asserted the orders were not long-term policy decisions because "the state of public health emergency has not lasted months and months, as it did with the COVID-19 pandemic." While this litigation has been pending, the gun violence[24] and drug abuse[25] EOs were each renewed thirteen times until they were permitted to expire in October 2024, over one year after they were first issued.

---

[24]*See* State of N.M., Exec. Ord. No. 2023-135 (Oct. 5, 2023); State of N.M., Exec. Ord. No. 2023-140 (Nov. 3, 2023); State of N.M., Exec. Ord. No. 2023-144 (Dec. 1, 2023); State of N.M., Exec. Ord. No. 2023-146 (Dec. 29, 2023); State of N.M., Exec. Ord. No. 2024-001 (Jan. 26, 2024); State of N.M., Exec. Ord. No. 2024-004 (Feb. 23, 2024); State of N.M., Exec. Ord. No. 2024-008 (Mar. 22, 2024); State of N.M., Exec. Ord. No. 2024-012 (Apr. 19, 2024); State of N.M., Exec. Ord. No. 2024-017 (May 17, 2024); State of N.M., Exec. Ord. No. 2024-030 (June 14, 2024); State of N.M., Exec. Ord. No. 2024-112 (July 15, 2024); State of N.M., Exec. Ord. No. 2024-125 (Aug. 14, 2024); State of N.M., Exec. Ord. No. 2024-141 (Sept. 13, 2024) (remaining in effect until Oct. 13, 2024).

[25]*See* State of N.M., Exec. Ord. No. 2023-136 (Oct. 5, 2023); State of N.M., Exec. Ord. No. 2023-141 (Nov. 3, 2023); State of N.M., Exec. Ord. No. 2023-145 (Dec. 1, 2023); State of N.M., Exec. Ord. No. 2023-147 (Dec. 29, 2023); State of N.M., Exec. Ord. No. 2024-002 (Jan. 26, 2024); State of N.M., Exec. Ord. No. 2024-005 (Feb. 23, 2024); State of N.M., Exec. Ord. No. 2024-009 (Mar. 22, 2024); State of N.M., Exec. Ord. No. 2024-013 (Apr. 19, 2024); State of N.M., Exec. Ord. No. 2024-018 (May 17, 2024); State of N.M., Exec. Ord. No. 2024-031 (June 14, 2024); State of N.M., Exec. Ord. No. 2024-113 (July 15, 2024); State of N.M., Exec. Ord.

{159} I do not mean to understate the gravity of either the gun violence or drug abuse problems in New Mexico. Both constitute grave, persistent public health challenges, that demand long-term, thoughtful responses. But the Governor's emergency powers under the PHERA exist as an exception to the Legislature's sole purview over policymaking. *See Reeb*, 2021-NMSC-006, ¶ 14 (discussing the Legislatures ability to delegate its policymaking powers to protect the public health and welfare "consistent with other constitutional requirements"). They are intended to afford the Governor the power to act quickly when study and deliberation are foreclosed by the exigency of the moment. *See Romero*, 2021-NMSC-009, ¶ 52 (Thomson, J., specially concurring) (observing that, in an emergency, "the need to immediately address a life-threatening situation does not necessarily allow for a full, open debate concerning all of the possibilities to arrive at a best and clearly constitutional response"). In my opinion, the EOs' omission of any indication of why the drug abuse and gun violence problems identified in the orders constitute sudden or unforeseen emergent threats, why immediate action is required, or the conditions under which the emergencies might end are fatal to the Governor's contention that they were lawfully issued pursuant to the PHERA.

No. 2024-126 (Aug. 14, 2024); State of N.M., Exec. Ord. No. 2024-140 (Sept. 13, 2024) (remaining in effect until Oct. 13, 2024).

## VI. THE MAJORITY'S INTERPRETATION OF THE PHERA RAISES CONSTITUTIONAL CONCERNS

{160} "We should avoid an interpretation of a statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question." *Adobe Whitewater Club of N.M. v. N.M. State Game Comm'n*, 2022-NMSC-020, ¶ 36, 519 P.3d 46 (text only) (citation omitted). Thus, even if the majority's reading of the statute is as reasonable as the interpretation I have offered, our rules of construction counsel us to adopt the construction that avoids constitutional concerns. *See Chavez*, 2022-NMSC-006, ¶ 40. In my view, the majority's interpretation of the PHERA raises concerns under our separation of powers jurisprudence.[26]

{161} Article III, Section 1 of the New Mexico Constitution provides that "[t]he powers of the government of this state are divided into three distinct departments, the legislative, executive and judicial, and no person or collection of persons charged

---

[26]The majority declines to address whether the PHERA violates the nondelegation doctrine of our separation of powers jurisprudence on the grounds that Petitioners failed to adequately brief it. *Maj. op.* ¶¶ 116-19. In my view, the failure of Petitioners to properly brief whether the Governor's actions violate the nondelegation doctrine does not relieve us of our duty to interpret the PHERA constitutionally—which includes rejecting an interpretation of the statute that raises separation of powers concerns. *See Lovelace Med. Ctr. v. Mendez*, 1991-NMSC-002, ¶ 12, 111 N.M. 336, 805 P.2d 603 (rejecting a construction of the statute that would "intrude directly into the separation of powers" and adopting a reasonable alternative interpretation instead).

with the exercise of powers properly belonging to one of these departments, shall exercise any powers properly belonging to either of the others, except as in this constitution otherwise expressly directed or permitted." While we have long held that "the executive, legislative, and judicial powers are not hermetically sealed," we have also stated that "they are nonetheless functionally identifiable one from another." *State ex rel. Clark v. Johnson*, 1995-NMSC-048, ¶ 33, 120 N.M. 562, 904 P.2d 11 (internal quotation marks and citation omitted). It is the Legislature's role to make policy through the creation of law and the executive branch's role to execute the law. *Id.* And it is the sole province of the Legislature to appropriate funds. *Candelaria*, 2023-NMSC-031, ¶ 34.

{162} These functional distinctions are important because legislative power cannot be delegated. *Unite N.M. v. Oliver*, 2019-NMSC-009, ¶ 9, 438 P.3d 343. At the same time, most courts (including this one) regularly approve delegations of authority from the legislative to the executive branch based on the common-sense rationale that there must be some overlap between the legislative and executive branches in carrying out the work of the government. *See Candelaria*, 2023-NMSC-031, ¶ 14 (observing that "[t]otal compartmentalization and separation of functions between the executive and legislative branches would result in a state of dysfunction"). "The separation-of-powers principle, and the nondelegation doctrine in particular, do not

prevent [the legislative branch] from obtaining the assistance of its coordinate Branches." *Mistretta v. United States*, 488 U.S. 361, 372 (1989). But the United States Supreme Court has also noted that "[i]n determining what [one branch] may do in seeking assistance from another branch, the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the government co-ordination." *Id.* (internal quotation marks and citation omitted).

{163} We have a well-established jurisprudence that sets the outer limits of this principle. The majority correctly observes that the separation of powers is violated when the action of one branch "prevents another branch from accomplishing its constitutionally assigned functions." *Maj. op.* ¶ 83. The majority focuses nearly all of its separation of powers analysis on this issue, *maj. op.* ¶¶ 83-115, concluding that Petitioners have failed to demonstrate that the emergency orders "constitute 'lawmaking' [or] usurp the Legislature's role and function." *Maj. op.* ¶ 106. But it is equally violative of the separation of powers principle when the Legislature delegates too much discretionary authority to the executive branch. *See Cobb v. State Canvassing Bd.*, 2006-NMSC-034, ¶ 41, 140 N.M. 77, 140 P.3d 498. Put simply, "[t]he Legislature may not vest unbridled or arbitrary authority in an administrative body . . . and must provide reasonable standards to guide it." *Id.* When faced with two alternative interpretations of a challenged statute—one that vests the Governor

with unbridled discretion and one that imposes meaningful standards to guide the Governor's discretion—we are compelled to adopt the latter. *See State ex rel. Schwartz v. Johnson*, 1995-NMSC-080, ¶¶ 21-22, 120 N.M. 820, 907 P.2d 1001; *Adobe Whitewater Club of N.M.*, 2022-NMSC-020, ¶ 36.

{164} Under my interpretation of the PHERA, the Governor's discretion to declare and act upon a public health emergency would be constrained by the requirement that the public health problem at issue be emergent and require immediate action to forestall substantial harm. By contrast, the majority's interpretation of the statute establishes no discernible limitation on the Governor's discretion to declare a public health problem an "emergency" at any time, to formulate and impose measures having the force of law whether or not necessary to immediately address the declared emergency, and to take these measures for as long as the Governor deems necessary. *Maj. op.* ¶¶ 35-49, 56. According to the majority, a threat may be ongoing (having occurred for any unspecified period of time), or it may occur at some unspecified time in the future that the Governor alone defines as "soon" to qualify as a public health emergency. *Maj. op.* ¶¶ 35-36. The majority similarly reads the PHERA as imposing no limitation as to when an ongoing or imminent condition gives rise to an "imminent threat of substantial harm" or when a public health emergency comes to an end. *Maj. op.* ¶¶ 49, 56.

{165}   Importantly, unlike public health emergency statutes in other jurisdictions, the PHERA imposes no express statutory limit on the length of time a public health emergency order may remain in effect or how often it may be renewed—something other courts have recognized as important in ensuring the proper separation of powers. *See, e.g.*, *Beshear v. Acree*, 615 S.W.3d 780, 811-12 (Ky. 2020) (stating that "[t]he duration of the state of emergency, at least the one at issue in this case, is also limited by [a statute enacted to address the COVID emergency] which requires the Governor to state when the emergency has ceased but, in any event, allows the General Assembly to make the determination itself if the Governor has not declared an end to the emergency before the first day of the next regular session of the General Assembly" (internal quotation marks and citation omitted)); *Snell v. Walz*, 6 N.W.3d 458, 463, 471 (Minn. 2024) (noting that the Minnesota national security or peacetime emergency statute, which limits a peacetime emergency to no "longer than 5 days unless extended by resolution of the Executive Council up to 30 days" and allows both houses of the legislature to terminate the state of emergency if the governor extends it beyond 30 days, "places durational limits" on the power of the governor, thereby easing separation of powers concerns (internal quotation marks and citation omitted)); *cf. In re Certified Questions*, 958 N.W.2d 1, 20-21, 24 (Mich. 2020) (striking down Michigan's public health emergency statute in part because it

allowed the governor to decide when the emergency ended, rendering the governor's powers under the statute "of indefinite duration"). While the majority states there is "little limitation as to the timing of a public health emergency," *maj. op.* ¶ 35, it is more accurate to say that, under the majority's interpretation, there is *no* temporal limitation on when a threat must appear to constitute a public health emergency.

{166} I agree that emergency orders under the PHERA raise no separation of powers concerns so long as they are *temporary*, do not address *normal* public health challenges, and do not undertake to institute *long-term* policy initiatives. *See Romero*, 2021-NMSC-009, ¶ 34 (upholding the Governor's use of emergency powers during the COVID-19 epidemic because "New Mexico ha[d] not entered a 'new normal,' [and] the temporary emergency orders [did not] constitute 'long-term policy' decisions"). However, in my view, the majority's interpretation of the PHERA, which is devoid of any standards or guidance constraining a governor's discretion to determine when and under what circumstances a public health emergency may be declared or how long it may last, fails to impose such constitutional limits. Our prior authority counsels us to avoid a construction where, as here, a reasonable alternative presents itself.

**VII. CONCLUSION**

{167} In departing from the majority's judgment in this matter, I am guided by my apprehension that the unconstrained exercise of emergency executive powers the majority has approved in this instance could readily be misused. While the Governor's desire to combat gun violence and drug abuse appears to be well-intended, there is nothing in the majority's opinion that would restrict a future governor from taking actions that would be substantively more troubling. This is not a hypothetical concern; emergency powers can and have been used elsewhere and at other times to accomplish what could not have been accomplished through the democratic process. Because the majority's opinion approves of an interpretation of the PHERA that confers unlimited emergency powers to the Governor, I must respectfully dissent.

_____
**BRIANA H. ZAMORA, Justice**

**I CONCUR:**

_____
**MICHAEL E. VIGIL, Justice**

111